(December 24, 2008)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PHILLIP RIBACK, Appellant. [870 NYS2d 517]—

Spain, J.

In late 2002 and 2003, defendant, a pediatric neurologist, was charged in two indictments, later consolidated, with 39 criminal counts alleging that he had sexual contact with numerous young male patients during medical examinations between 1997 and November 2002. After pretrial proceedings in which some counts were dismissed, defendant went to trial on 30 counts. He was ultimately convicted of 28 counts, 12 felonies—nine counts of sexual abuse in the first degree (*see* Penal Law § 130.65 [1] [counts 30 and 31], [3] [counts 1, 6, 8, 12, 15, 18 and 35]), two counts of course of sexual conduct against a child in the second degree (*see* Penal Law § 130.80 [1] [b] [counts 10 and 20]), and sodomy in the first degree (*see* Penal Law 130.50 [3] [count 14])—and 16 misdemeanors—11 counts of endangering the welfare of a child (*see* Penal Law § 260.10 [1]), two counts of forcible touching (*see* Penal Law § 130.52 [2]), two counts of sexual abuse in the second degree (*see* Penal Law § 130.60 [2]) and sexual abuse in the third degree (*see* Penal Law § 130.55).

The convictions stem from the testimony of 14 boys, none of whom knew one another (except two were brothers), whose families consulted defendant for their sons' various neurological problems. The boys described a variety of conduct that occurred for the most part after their parents complied with defendant's request that they leave the boys alone with him in the examining room, at which time defendant encouraged them to play a "controlled spitting" game with him, tickled, hugged or kissed them or play-wrestled with them, pushed his erect penis against

their bodies, held them upside down by the ankles or had the boys sit or lay on him, during which time defendant's hands or face came into contact with the boys' genitals, mostly over clothing (several described defendant's direct—underneath clothing—contact with their penis), or the boys' faces were pushed into defendant's genital area over clothing. All of the contact occurred in the subterfuge of a medical exam by defendant, often accompanied by warnings not to tell anyone.

None of the boys immediately reported the sexual contact that occurred during their office visits, although the testimony established that many of them exhibited strong emotions and behavioral problems immediately after their visits, attempted to avoid further contact with defendant, and described some of defendant's bizarre conduct such as the controlled spitting game to their parents. Defendant's conduct was first partially revealed in September 2002, when patient A (the subject of counts 1 and 2) made revelations first to his mother and then to the Town of Colonie Police Department and the Department of Health's Office of Professional Medical Conduct (hereinafter OPMC), later providing a signed statement to police recounting the extent of defendant's sexual contact with him in December 2001, when he was nine years old. After another family made a complaint to OPMC, an OPMC investigator referred that patient (the subject of counts 3 through 5) to the Colonie police, and he signed a written statement describing defendant's forcible touching of him during an examination in January 2002, when he was 14 years old. Based upon these and other allegations, defendant was arrested. After media coverage of the arrest, over 100 people contacted the police and approximately 50 were interviewed, leading to the subject consolidated indictment.

Defendant did not testify at trial, but pursued the defense theory that any unusual behavior by him during patient exams was designed to create a rapport with—and put at ease—his young patients. The defense argued that, only after suggestive and coercive questioning by police and parents, were the boys persuaded to interpret his innocent and benign behavior as having a sexual component, leading to false or mistaken accusations. The defense repeatedly emphasized the boys' lengthy delays in disclosing defendant's conduct (ranging from 8 to 37 months) and the fact that most of the boys' disclosures of sexual contact did not occur until after defendant's initial arrest, in support of its theory that all of the boys' sexual contact allegations were the product of the publicity and suggestive questioning.

Upon his convictions, defendant was sentenced to an aggre-

gate prison term of 48 years, with five years of postrelease supervision. Defendant's posttrial motion to vacate the judgment of conviction was denied without a hearing. Defendant now appeals from both the judgment of conviction and, with permission, the order denying his motion to vacate.

Initially, defendant challenges eight of his felony convictions as against the weight of credible evidence. We are not at all persuaded, finding that, given the overwhelming credible testimony, a different verdict would indeed have been unreasonable and, in any event, were we to weigh the probative force of the conflicting testimony and rational inferences to be drawn, we would find that the jury was more than justified in finding defendant guilty beyond a reasonable doubt (*see People v Danielson*, 9 NY3d 342, 348 [2007]; *People v Romero*, 7 NY3d 633, 643-644 [2006]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). The challenged first degree sexual abuse counts (counts 1, 6, 8, 18 and 35) required proof that defendant subjected a person under age 11 to "sexual contact" (Penal Law § 130.65 [3]), i.e. "any touching of the sexual or other intimate parts . . . for the purpose of gratifying sexual desire," including "the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing" (Penal Law § 130.00 [3]). Three patients in the challenged counts described defendant's touching of their genitals over clothing: patient A testified that defendant had him sit on defendant's chest and pushed the boy's penis into defendant's face (count 1); patient B described defendant placing his face in the boy's penis area and rubbing, an incident that was witnessed by patient B's mother, who also testified (count 6); and patient E recounted that defendant touched his penis and testicles (count 35). Patient C testified that defendant touched his penis over and underneath his clothing, and his adult sister testified that defendant had an erection before the family left the boy alone in the examination room with defendant (count 8). Patient D described how defendant had him lie on top of him, and defendant pushed the boy's head into his groin, and also how defendant held him upside down by the ankles causing the boy's face to make contact with defendant's genital area (count 18). The foregoing convincingly established that, in each instance, sexual contact occurred, and that it was for the purpose of defendant's sexual gratification, the latter being a subjective inquiry readily inferable from defendant's conduct and intimate genital contact with nonrelatives with no medical justification (*see People v*

*Watson*, 281 AD2d 691, 697-698 [2001], *lv denied* 96 NY2d 925 [2001]; *see also People v Hill*, 34 AD3d 1130, 1131 [2006]).[1]

Defendant also challenges—as against the weight of the evidence—his convictions for course of sexual conduct against a child in the second degree (counts 10 and 20), which requires proof that, over a period not less than three months, defendant, being over age 18, engaged in two or more acts of sexual conduct with a child less than age 13 (*see* Penal Law § 130.80 [1] [b]). Patient F testified that on several occasions during the years he was treated by defendant—1997 to 2002—defendant rubbed his erect penis against the boy's clothed body, leg or hands (count 10). Patient G recounted instances during his treatments with defendant over a three-year period where defendant pinched his buttocks, touched his genitals for five seconds over clothing after fake-tripping, and held the boy down and pushed his chin into the child's groin area for upwards of 10 seconds. We find that this testimony credibly established defendant's commission of these crimes as charged, including the durational requirement that they occurred over a period of at least three months (*see People v Raymo*, 19 AD3d 727, 729 [2005], *lv denied* 5 NY3d 793 [2005]; *see also People v Weber*, 25 AD3d 919, 921 [2006], *lv denied* 6 NY3d 839 [2006]). Finally, patient H's testimony established that, during an examination when he was 10 years old, defendant pulled the boy's pants and boxers down and defendant's lips came into contact with the boy's unclothed penis during the exam, supporting the conviction of sodomy in the first degree (count 14) (*see* Penal Law § 130.50 [3]). To the extent that defendant cites minor inconsistencies in any of the victims' testimony concerning tangential matters—such as defendant's apparel, whether there was a sink in the room or a lock on the door, and the exact dates or frequency of visits—we find that there was nothing incredible or unbelievable in their testimony, which the jury rationally credited after observing their demeanor, and that any uncertainties in their testimony did not concern whether the described sexual contact occurred as charged (*see People v Weber*, 25 AD3d at 921). As such, we find these convictions to be supported by the weight of credible evidence.

Next, defendant contends that certain remarks by the prosecutor during summation deprived him of a fair trial. We have closely examined each of his contentions, individually and collectively, many of which are unpreserved. At the outset, we

---

1. Notably, the testimony of the People's expert pediatric neurologist was unrefuted that there was no medical, neurological justification for the described sexual contact.

note that the prosecutor's conduct and tenor during the trial itself, prior to summation, can be fairly characterized as even-handed, appropriate and not calculated to inflame or detract the jury. Viewing the summation as a whole, however, we agree that certain remarks exceeded the bounds of fair advocacy, but we find that they were not so egregious or prejudicial as to deprive defendant of a fair trial and did not operate to detract the jury from the issue of his guilt of the crimes charged (*see People v Calabria*, 94 NY2d 519, 523 [2000]; *People v Tarantola*, 178 AD2d 768, 770 [1991], *lv denied* 79 NY2d 954 [1992]).

First, defendant did not object to the prosecutor's remarks in summation that defendant fit the definition of a pedophile, to which the People's expert had testified. However, given that this reference arguably stems from County Court's midtrial ruling—to which defendant did raise an objection—allowing the People's expert psychologist, Richard Hamill, to define the terms "pedophile" and "sexual fetish," we will address it. After Hamill, who has extensive experience treating sex offenders and their victims, testified regarding child abuse accommodation syndrome (*see People v Weber*, 25 AD3d at 923), the court heard arguments and permitted him, over objection, to generically define these terms and describe their characteristics.[2] Notably, Hamill had never evaluated defendant or any of these victims, and never expressed any opinion about whether defendant's behavior fit within or was consistent with those definitions, or whether the charged crimes had occurred, appropriately leaving those issues for the jury to resolve.

The admission of expert testimony lies within the sound discretion of the trial court (*see People v Williams*, 97 NY2d 735, 736 [2002]; *People v Lee*, 96 NY2d 157, 162 [2001]), because "[i]t is for the trial court in the first instance to determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation

---

**2.** Hamill testified that "[s]exual [f]etish is a term that refers to an individual who gains sexual arousal or sexual gratification from an atypical sexual act, specifically a sexual attraction to a certain type of stimulus or a certain sexual act." He further testified that "[t]he characteristics [of a sexual fetish] are that a person . . . gains sexual arousal or sexual gratification from an object or an act which most people would not find to be sexually arousing." Hamill defined pedophilia as "a sexual preference for children under the age of puberty, [or] a strong preference for children preferably under the age of [12]," and indicated that "[a] pedophile is an individual who experiences this sexual disorder." He explained that "[t]he central characteristic is the sexual attraction to prepubescent children. It may be exclusive or nonexclusive, and it may be directed toward children of the same sex, opposite sex, or some, about 25%, of these individuals have a sexual attraction to children of both genders."

and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness" (*People v Cronin*, 60 NY2d 430, 433 [1983]; *see People v Taylor*, 75 NY2d 277, 288 [1990]). Given the testimony regarding defendant's bizarre behavior accompanying his sexual contact—e.g., the controlled spitting game, wrestling, tickling and toe sucking—directed at young boys, and the central, disputed issue of whether defendant's various behaviors were committed for the purpose of sexual gratification, an element of many of the counts, or were "accidental" or benign, as the defense vehemently urged, we find that County Court providently exercised its discretion in permitting this limited generic testimony, based upon its finding that these terms, behaviors and preferences are outside the ken of a typical juror (*see People v Cronin*, 60 NY2d at 433; *see also People v Lee*, 96 NY2d at 162).

Defense counsel argued in his summation that the boys' disclosures had been coerced and suggested by parents and police, in an atmosphere of "hysteria" following defendant's arrest, in which the public was alarmed that defendant "was a pedophile doctor and parents whose kids had treated with him now should come forward and call the Colonie Police Department." In response, the prosecutor in summation stated, "You heard the definition of pedophile, didn't you? He can't stop." Then, later, "You heard the definition of pedophile. [Defendant is] having sex with boys in his office. [He is] not concentrating on medicine. [He is] concerned with gratifying his own sexual desire."

We recognize that summation remarks describing a defendant as "a pedophile" are generally unwarranted and may operate to detract and inflame the jury in a manner which undermines a fair trial (*see People v Barber*, 13 AD3d 898, 901 [2004], *lv denied* 4 NY3d 796 [2005]; *see also People v Nickel*, 14 AD3d 869, 872 [2005], *lv denied* 4 NY3d 834 [2005]; *People v Carney*, 222 AD2d 1006, 1006 [1995], *lv denied* 88 NY2d 877 [1996]). We find that the prosecutor's remarks here were fair comment on the properly admitted expert testimony and on the defense summation. Essentially, the prosecutor was arguing that defendant's conduct, as described by the testifying patients, was consistent with the definition of the sexual disorder of pedophilia and undertaken for the purpose of sexual gratification. We do not find that these limited remarks or any other aspects of the summation sidetracked the jury from the issue of defendant's guilt or innocence, were irrelevant to the crimes charged (*compare People v Calabria*, 94 NY2d at 523; *People v De Vito*, 21 AD3d 696, 700 [2005]), or rose to the level of depriving defendant of a fair trial (*see People v Barber*, 13 AD3d at 901). Further, any er-

ror was harmless in view of the overwhelming and powerful evidence of defendant's guilt (*see People v Crimmins*, 36 NY2d 230, 241-242 [1975]; *People v Smith*, 291 AD2d 575, 576 [2002], *lv denied* 98 NY2d 702 [2002]).

To the extent that the prosecutor's summation suggested that there were other children who would have implicated defendant, but their parents did not want to put them through a trial (and that the parents of the testifying children were brave), defendant's objections were immediately and repeatedly sustained and the jury instructed to disregard the comments. While these references were of course totally improper and should have been scrupulously avoided, as the People now candidly concede (*see People v Mendez*, 22 AD3d 688, 689 [2005]; *People v Smith*, 288 AD2d 496, 497 [2001]), the jury was aware of the substantial response to defendant's arrest.[3] Indeed, the defense itself aggressively exploited this by arguing that the

---

**3.** Defendant also challenges the admission of testimony concerning the public response to his arrest, although the parties stipulated prior to trial that they would probe the facts of how the case began as background information. In its opening, the defense pursued the theory that the boys' inculpatory statements were the direct product of suggestive, improper police questioning in a charged atmosphere. At trial, when Detective Kenneth Fuchs testified that after defendant's arrest and press coverage, the Colonie police received approximately 120 telephone calls, the defense objected and County Court immediately instructed the jury that it was "to consider that evidence only in terms of what happened from that point forward. You are not to infer anything negative from the number of phone calls that were received. It's not relevant . . . for any fact in issue regarding [this] indictment against defendant . . . I [am] allowing that in only so that you will understand the flow of events [and] in what context this witness then took some further action." No objection was raised to that charge or ruling. Patrice Lockhart later testified to the manner in which the Colonie police processed the telephone calls that followed defendant's arrest and, when defendant objected, the court instructed the jury that it would be allowed "just so you will know this witness's state of mind and what she did next as a result of this information." No further or specific objection was raised by the defense. Neither witness suggested that there were other victims who had incriminated defendant but were afraid or reluctant to pursue charges. In our view, the testimony was properly admitted for nonhearsay background purposes—i.e., to explain the police department's actions and the course of its investigation (*see People v Davis*, 23 AD3d 833, 834-835 [2005], *lv denied* 6 NY3d 811 [2006]; *cf. People v McEaddy*, 41 AD3d 877, 879 [2007] [police recounted statements by nontestifying witnesses identifying the defendant as the perpetrator, offered for their truth]), and County Court properly instructed the jury on the limited purpose of this testimony (*see People v Johnson*, 40 AD3d 1011, 1012 [2007], *lv denied* 9 NY3d 923 [2007]). It did not constitute "uncharged crime testimony" or "improperly divert the jury from the case at hand or introduce more prejudice than evidentiary value" (*People v Resek*, 3 NY3d 385, 389 [2004]). Indeed, the public atmosphere and police response and assertedly suggestive investigative

boys' disclosures had been coerced in what it characterized as an atmosphere of "hysteria" following defendant's arrest, as County Court recognized in denying defendant's mistrial motion on this basis. While inappropriate, we do not find that these brief remarks were so prejudicial in the context of this trial as to deprive defendant of a fair trial (*see People v Weber*, 25 AD3d at 924).

The prosecutor also argued in summation that "[a]ll you have to do is believe one [child]. You believe one [child] and it's over, because this huge grand conspiracy of police and children and parents and the District Attorney and everyone else, it's a house of cards . . . If you believe one child, you *can* believe all" (emphasis added). Defendant's objection was overruled and County Court charged the jury that "[y]ou're going to be bound by the law as I give it to you in this case." While the prosecutor's argument could have been more clearly articulated to avoid being misleading, we do not find that this remark in any manner had the effect of reducing the People's burden of proof, as defendant argues for the first time an appeal. Rather, we find that it was a fair argument by the People, as the court ruled in denying defendant's mistrial motion, that the jury could reject the defense's conspiracy theory—i.e., that the whole group of boys was coerced into implicating defendant as the result of suggestive police interviewing techniques—if they credited any of the testifying boys' accounts regarding his disclosure of defendant's conduct. Likewise, defendant's objection to the prosecutor's denigration of the defense for calling four witnesses to testify that defendant did not molest their family members who he had treated was sustained, and the jury was instructed to disregard these comments. The prosecutor never said that there were only four such witnesses, instead arguing, "We never said he molested everyone, we said he molested these 14 kids," which the court rightfully admitted as fair comment.

We have examined the balance of defendant's claims regarding the summation and find many were not preserved and most were fair comment on the evidence or the defense theory and summation (*see People v Grady*, 40 AD3d 1368, 1374-1375 [2007], *lv denied* 9 NY3d 923 [2007]). While the summation was not error-free, the unwarranted and improper comments did not taint the verdict and, when considered individually or even collectively, were not so substantially prejudicial or egregious as to deprive defendant of a fair trial, especially given the strength of the People's case and the overwhelming evidence of defen-

---

techniques were a central focus of the defense in explaining why the boys inculpated defendant.

dant's culpability (*see People v Calabria*, 94 NY2d at 523; *People v Roopchand*, 107 AD2d 35, 36 [1985], *affd* 65 NY2d 837 [1985]; *People v Tarantola*, 178 AD2d at 770; *cf. People v De Vito*, 21 AD3d at 696-701; *People v Gorghan*, 13 AD3d 908, 909-911 [2004], *appeal dismissed* 4 NY3d 798 [2005]; *People v Levandowski*, 8 AD3d 898, 900-901 [2004]).

Finally, while "[t]he mere fact that a sentence imposed after trial is greater than that offered in connection with plea negotiations is not proof [positive] that defendant was punished for asserting his right to trial" (*People v Simon*, 180 AD2d 866, 867 [1992], *lv denied* 80 NY2d 838 [1992]; *see People v Pena*, 50 NY2d 400, 412-413 [1980], *cert denied* 449 US 1087 [1981]; *People v Massey*, 45 AD3d 1044, 1048 [2007], *lv denied* 9 NY3d 1036 [2008]; *People v Chappelle*, 14 AD3d 728, 729 [2005], *lv denied* 5 NY3d 786 [2005]), "the considerable disparity between the sentence offered prior to trial [5 to 7 years with a plea to one felony] and that ultimately imposed after trial [48 years aggregate][4] strikes us as too extreme a penalty for defendant's exercise of his constitutional right to a jury trial" (*People v Morton*, 288 AD2d 557, 559 [2001], *lv denied* 97 NY2d 758 [2002], *cert denied* 537 US 860 [2002]). Without in any respect minimizing defendant's egregious breach of the trust placed in him by his young patients and their families, as well as his honored profession, the People have long had a strong case supported by numerous credible witnesses and, thus, no problems in their proof justified this substantial disparity (*id.*). The extent of harm caused by defendant's conduct against these victims was known at the time of the plea offer; the desire to save these patients and their families from the burden and stress of a trial—while certainly a conscientous purpose we fully appreciate—cannot justify the 40-year disparity.[5] Defendant, who was 47 years old at the time of sentencing, had no criminal record of any kind. While the People "may encourage a guilty plea by offering substantial benefits" (*People v Pena*, 50 NY2d at 411), and defendant forfeited the benefit of the plea offer by electing to go to trial (*see People v Van Pelt*, 76 NY2d 156, 160, [1990], "County Court may have placed undue weight upon defendant's ill-advised decision to reject the very favorable plea bargain and proceed to trial" (*People v Morton*, 288 AD2d at 559). We are therefore persuaded to exercise our interest of justice jurisdic-

---

**4.** County Court imposed nine consecutive determinate four-year sentences on each of the class D felonies (except counts 15 and 31, which were made concurrent); a five-year consecutive sentence on count 30; and an 11-year consecutive sentence on the sodomy count, a class B felony (count 14).

**5.** Notably, the statutory aggregate maximum for these violent class B and D felonies is 50 years of imprisonment (*see* Penal Law § 70.30 [1] [e] [vi]).

tion to modify defendant's sentence (*see* CPL 470.15 [6] [b]). Accordingly, we direct that defendant's nine four-year sentences on the class D felonies shall run concurrently (counts 1, 6, 8, 10, 12, 15, 18, 20 and 35), but remain consecutive to the sentences on count 14 (11 years) and count 30 (five years), for a total aggregate prison sentence of 20 years.

Further, County Court correctly denied defendant's posttrial motion to vacate the judgment of conviction based upon newly discovered evidence (*see* CPL 440.10 [1] [g]).[6] Defendant failed to show, by a preponderance of evidence, that information gleaned in the victims' civil-suit depositions (taken after this trial) regarding the Colonie Police Department's investigative techniques and manner of interviews could not have been discovered by defendant prior to this trial with due diligence. Indeed, this was the defense's central focus at trial in cross-examining the boys, their families and the Colonie police employees (*see People v Tucker*, 40 AD3d 1213, 1214 [2007], *lv denied* 9 NY3d 882 [2007]; *see also* CPL 440.30 [6]). Likewise, the postverdict diagnosis of Asperger's syndrome (considered at sentencing) was not shown to be undiscoverable prior to trial with due diligence, material to defendant's criminal liability (defendant concedes that it is not a defense to the charges), or such that it " 'will probably change the result if a new trial is granted' " (*People v Lackey*, 48 AD3d 982, 983 [2008], *lv denied* 10 NY3d 936 [2008], quoting *People v Priori*, 164 NY 459, 472 [1900]; *see* CPL 440.10 [1] [g]). Defendant's remaining contentions are also without merit.

Mercure, J.P., Carpinello and Stein, JJ., concur.

Malone Jr., J. (dissenting). I dissent. I believe that it was error for County Court to allow expert testimony at the trial by psychologist Richard Hamill, who was called for the stated purpose of explaining why abused children will often initially deny the fact that they were abused and then, over objection, to describe the terms "sexual fetish" and "pedophilia" to the jury. This mistake by County Court then rose to the level of reversible error when the prosecutor, in the course of his passionate summation, twice referred to defendant as a pedophile[1] and said that this was why defendant was having sex with young boys in his office and could not stop. I disagree with County Court's ruling that allowed these terms to even be explained to the jury

---

**6.** Defendant's motion was also premised on ineffective assistance of counsel, which County Court also rejected, and defendant has expressly abandoned that claim on appeal.

**1.** To label defendant a "pedophile" in the context of this trial is, I am convinced, nothing short of calling him a modern day devil.

and, when such extremely prejudicial testimony was allowed to become the opinion and central theme of the prosecutor in his summation, the prosecutor transformed Hamill's improper explanations into his own improper expert opinion.[2]

I agree with the majority that there were multiple other summation misstatements of fact and law by the prosecutor. In my view, however, when combined with the opinion by the prosecutor that defendant's acts were those of a pedophile, these misstatements rose to such a level that defendant was deprived of the fair trial to which he was entitled (*see People v Calabria*, 94 NY2d 519, 523 [2000]; *People v De Vito*, 21 AD3d 696, 700 [2005]). Among the most bothersome are the statements made by the prosecutor at the end of his summation that there were probably many more children who defendant had abused and the statement, made twice, that if the jury believed the testimony of one child, then it could believe all of the children who testified.

Defendant also argues that County Court erred when it denied his CPL 440.10 (1) (g) motion to vacate the judgment of conviction because he had been diagnosed, after trial, as suffering from Asperger's syndrome. While evidence of this diagnosis might be admissible at a new trial on the issue of defendant's mens rea when engaging in the conduct described by the trial witnesses, I do not believe that the issue alone is sufficient to require a new trial (*see People v Terry*, 44 AD3d 1157, 1159 [2007], *lv denied* 10 NY3d 772 [2008]; *People v Hogencamp*, 300 AD2d 734, 736 [2002]).

Accordingly, because in my opinion defendant was denied his right to a fair trial, the judgment of conviction should be reversed and the matter remitted to County Court for a new trial.

Ordered that the judgment is modified, as a matter of discretion in the interest of justice, by reversing so much thereof as imposed an aggregate prison term of 48 years; defendant resentenced to an aggregate prison term of 20 years; and, as so modified, affirmed. Ordered that the order is affirmed.

---

**2.** I do not suggest that the psychologist had such an opinion. There is nothing in the record to suggest that he did. It is noteworthy that the prosecutor never asked any questions seeking that opinion.