[859 NE2d 902, 826 NYS2d 163]

The People of the State of New York, Respondent, v Ubaldo Romero, Appellant.

Argued October 18, 2006; decided November 21, 2006

## POINTS OF COUNSEL

*Center for Appellate Litigation,* New York City (*William A. Loeb* and *Robert S. Dean* of counsel), for appellant. The Appellate Division, in affirming appellant's conviction on weight of the evidence review, erred in looking solely to whether there was any support in the record for the jury's resolution against appellant of the conflicts in the witnesses' testimony, pursuant to *People v Gaimari* (176 NY 84, 94 [1903]), rather than undertaking its own review of the conflicts in the testimony to determine whether appellant's conviction was against the weight of the credible evidence. (*People v Bleakley,* 69 NY2d 490; *People v Acosta,* 80 NY2d 665; *People v Cahill,* 2 NY3d 14; *Tibbs v Florida,* 457 US 31; *People v Vargas,* 7 NY2d 555; *People v Luscomb,* 292 NY 390; *People v Lytton,* 257 NY 310; *People v Sanducci,* 195 NY 361; *People v Becker,* 210 NY 274; *People v Crum,* 272 NY 348.)

*Robert M. Morgenthau, District Attorney,* New York City (*Susan Gliner* and *Mark Dwyer* of counsel), for respondent. I. The First Department applied the correct standard when if found that the jury's verdict was not against the weight of the credible evidence. (*People v Gaimari,* 176 NY 84; *People v Bleakley,* 69 NY2d 490; *People v Cahill,* 2 NY3d 14; *Tibbs v Florida,* 457 US 31; *People v Smith,* 63 NY2d 41; *People v Wood,* 12 NY2d 69; *People v Peller,* 291 NY 438; *People v Crum,* 272 NY 348; *People v Noble,* 86 NY2d 814.) II. Robert Romero's complaint about a single set of remarks made during the prosecutor's summation is unpreserved and completely without merit. (*People v Robinson,* 36 NY2d 224; *People v Everson,* 100 NY2d 609; *People v Johnson,* 210 AD2d 174; *People v Allende,* 269 AD2d 211; *People v Warrick,* 261 AD2d 152; *People v Galloway,* 54 NY2d 396; *People v Nai Hing Liang,* 208 AD2d 401; *People v D'Alessandro,* 184 AD2d 114; *People v Halm,* 81 NY2d 819; *People v Marks,* 6 NY2d 67, 362 US 912.)

## OPINION OF THE COURT

GRAFFEO, J.

Citing *People v Gaimari* (176 NY 84 [1903]), the Appellate Division rejected defendant's argument that the jury's verdict

was against the weight of the evidence. The issue for us to decide is whether the Appellate Division's reliance on *Gaimari* indicates that the Court failed to apply the correct legal standard for reviewing this weight of the evidence claim. For the reasons that follow, we conclude that the Appellate Division did not err.

## I.

On November 1, 1990, Rafael Baez, Etienne Adorno and Demetrio Flores drove to a location in northern Manhattan, ostensibly for the purpose of robbing a drug dealer. Upon arrival, Baez exited the car to make a telephone call. At about the same time, a group of men armed with guns emerged from a nearby apartment building, approached the vehicle and fired their weapons, killing both Adorno and Flores.

According to various accounts, defendant Ubaldo Romero, his three brothers (codefendants Robert, George and Julio Romero) and a 14-year-old boy (referred to as Wilson C.) committed the murders. The Romero brothers operated a narcotics trafficking enterprise and used street dealers in the area where Adorno, Baez and Flores had gone to commit the robbery. Alerted to the presence of the would-be robbers, the Romeros, accompanied by Wilson C., went to an apartment and gathered firearms. Some witnesses recounted that after the group exited the building, one of the Romeros managed to get close to the car and shot at the driver. Defendant and Wilson C. simultaneously fired their weapons toward the vehicle. The perpetrators then fled the scene.

A police investigation revealed that Adorno and Flores had been shot multiple times and that neither man fired back at their assailants. Although the police were initially unable to identify the shooters, over the course of a decade investigators uncovered evidence that led them to suspect the Romeros. In 1999, the Romeros and Wilson C. were jointly indicted for two counts of intentional murder in the second degree. Wilson C. pleaded guilty to manslaughter in the first degree and, because of his age at the time of crime, was sentenced as a juvenile offender. The Romeros opted for a jury trial, which resulted in a mistrial when the jury could not render a unanimous verdict. At the retrial, the defense challenged the credibility of the People's witnesses based on inconsistencies in their factual recollections and because they had entered into cooperation agreements with the prosecution in return for favorable treatment regarding

their own criminal activities. Ultimately, the jury acquitted George and Julio Romero but convicted Robert Romero and defendant of both homicide counts.

Among his arguments on appeal, defendant asserted that the jury's verdict was against the weight of the evidence. The Appellate Division rejected that argument and affirmed, explaining:

> "The jury properly considered issues of credibility, including the weight to be given to the backgrounds of the People's witnesses, the benefits they received in return for testifying and the inconsistencies in their testimony, and there is no basis for disturbing the jury's determinations (see People v Gaimari, 176 NY 84, 94 [1903]). Numerous witnesses inculpated defendant[ ], and the jury could have reasonably concluded that differences in their perception and memory of details of this fast-paced, chaotic event accounted for the inconsistencies" (22 AD3d 287, 287 [1st Dept 2005]).

A Judge of this Court granted leave.

## II.

Defendant contends that the Appellate Division erred as a matter of law by citing exclusively to *People v Gaimari* (176 NY 84 [1903]) in rejecting his assertion that the jury's verdict was against the weight of the evidence. According to defendant, the *Gaimari* analysis of the duty of an appellate court in determining whether the evidence supports a conviction conflicts with modern formulations of the parameters of weight of the evidence review, as articulated in *People v Bleakley* (69 NY2d 490 [1987]). In order to assess the validity of this claim, we find it helpful to examine the historical antecedents that preceded codification of the authority of appellate courts to engage in weight of the evidence review (see CPL 470.15 [5]; 470.20 [5]; 470.30 [1]).

At common law, appellate review of a criminal conviction, regardless of how grave the offense, was not viewed as a necessary component of elementary due process. The prevailing principle was that, " 'if a defendant be *convicted* of felony or treason, though against the weight of evidence, there is no instance of a motion for a new trial in such a case, but the judge passes sentence, and respites execution, till application can be made to the mercy of the crown' " for a pardon (*People v Com-*

*stock*, 8 Wend 549, 549 [1832], quoting *The King v Mawbey*, 6 Term Rep 625; *see People ex rel. Case v Judges of Dutchess Oyer & Terminer*, 2 Barb 282, 293 [1847] ["(i)f a verdict is rendered against the accused without sufficient evidence, he can always apply for, and generally obtain, a pardon"]). It was therefore "wholly within the discretion of the State to allow or not to allow such a review" and, in the absence of a constitutional or statutory provision authorizing an appeal, a defendant had no recourse for raising claims of error (*see McKane v Durston*, 153 US 684, 687 [1894]).

The New York Legislature, however, provided for very limited review of criminal convictions in early statutory enactments (*see* 2 Rev Stat of NY, part IV, ch II, tit III, § 42 *et seq.*, at 717-719 [1st ed 1829]; *People v Dalton*, 15 Wend 581, 583 [1836], citing 1813 Rev L of NY, 36th Session, ch IV, § VI [1 Van Ness and Woodworth rev at 326], derived from Statute of Westminster 2, 13 Edw 1, ch 31). "[T]he revised statutes only authorize[d] the defendant, on the trial of an indictment, to except to decisions of the court in the same cases, and in the manner provided by law in civil cases" (*People v Haynes*, 14 Wend 546, 554 [1835]). At that time, it was "well settled, in civil cases, that the . . . decision of the jury upon matters of fact, cannot be reviewed on a bill of exceptions, where there ha[d] been no erroneous decision of the court upon matters of law" (*id.*; *see People v Dalton*, 15 Wend at 584). Reflecting the deference afforded to credibility determinations by juries in civil cases, a criminal defendant could not attack a conviction on the ground that "the verdict of the jury was against evidence" since that was seen as a factual issue rather than a question of law (*Vanderwerker v People*, 5 Wend 530, 531 [1830]; *see* 1 Colby, Practical Treatise upon the Criminal Law and Practice of the State of New York, at 436 [1868]).

Some doubt was raised about the definitiveness of this principle as the courts began to recognize a need to allow for appellate intervention in order to correct manifestly unjust verdicts:

> "There must be something in the case taking from the [trial] court its discretion [to deny a motion for a new trial] . . . as in the case . . . where the testimony was clear and explicit, and uncontradicted, and yet a verdict against it, and a refusal to set aside such verdict. In such case there would be

no discretion; every verdict must be supported by evidence; where it is not, the law gives to the party injured a legal right to have it set aside, and a new trial ordered. Should any court possessing the power refuse to exercise it in such a case, it would be our duty to correct the error by mandamus. In such a case, where there is no dispute about facts, there is no discretion to exercise" (*People ex rel. Oelricks v Superior Ct. of City of N.Y.*, 10 Wend 285, 290-291 [1833]; *see Ex parte Baily*, 2 Cow 479, 483 [1824]).

Consistent with the judiciary's concern about being unable to overturn clearly incorrect guilty verdicts, in 1855 the Legislature enacted a law, "conceived[ ] in a spirit of liberal and enlightened humanity" (*O'Brien v People*, 36 NY 276, 278 [1867]), that allowed appellate courts to entertain a challenge to the weight of the evidence supporting a verdict:

"Every conviction for a capital offence, or for one punishable as a minimum punishment by imprisonment in state prison for life, shall be brought before the supreme court and court of appeals . . . by a writ of error, with a stay of proceedings as a matter of right. And the said appellate court may order a new trial if it shall be satisfied that the verdict against the prisoner was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below" (L 1855, ch 337, § 3; amended L 1858, ch 330, § 1).

In simple terms, this statute established two new appellate functions in reviewing convictions that carried sentences of death or life imprisonment: the power to examine the facts of a case and determine whether the verdict was manifestly unjust, against the law or not supported by the weight of the evidence; and the authority to review alleged errors that had not been objected to during the trial—the equivalent of today's "interest of justice" jurisdiction (*see* CPL 470.15 [3] [c]; [6] [a]).

Pursuant to the new powers granted by the act of 1855, this Court determined that it had an

"imperative duty . . . to examine carefully the whole record, and, if satisfied that the verdict is against the weight of evidence, or [not] authorized by law, or, if it shall be of opinion that justice requires a new trial, then the same shall be granted,

whether or not any exception shall have been taken in the court below" (*Ferris v People*, 35 NY 125, 126 [1866]; *see Sanchez v People*, 22 NY 147, 155 [1860]).

But the precise scope of that review was not clear. In some cases, the Court began with the presumption that the jury's verdict was factually correct and then reviewed the record to decide if that presumption was rebutted by the force of the evidence (*see e.g. Levy v People*, 80 NY 327, 337 [1880] ["It is not enough that the verdict may possibly be wrong, but that, after giving proper weight to all the evidence, it cannot be right"]). In other cases, the Court questioned whether appellate review required a "*res nova*" examination of the record (*Ferris v People*, 35 NY at 126)—that is, should the appellate court engage in a review as if the jury had never considered the case and it was being presented to the court as a matter of first impression (*see* Black's Law Dictionary, at 1337 [8th ed])? The standard for appellate review thus remained unsettled (*see Levy v People*, 80 NY at 337).

In 1881, the consolidated Code of Criminal Procedure was enacted (*see* L 1881, ch 442). In its codification efforts, the Legislature abolished the common-law writs that had been used to challenge criminal convictions and instituted the modern-day appeal as the exclusive method for reviewing a judgment or order in a criminal action (*see* former Code Crim Pro § 515 [1881]). The Code permitted an appeal as of right in certain cases to an intermediate appellate court (at that time, Supreme Court), as well as to the Court of Appeals (*see id.* §§ 517-520). However, the drafters of the Code apparently neglected to incorporate the preexisting extraordinary powers of review from chapter 337, § 3 of the Laws of 1855 with respect to appeals from convictions punishable by death or life imprisonment.

This oversight was corrected in 1887, together with some modifications to the act of 1855 (*see* L 1887, ch 493). Notably, the intermediate appellate court's authority to review weight of the evidence and exercise interest of justice jurisdiction was significantly expanded to encompass all criminal convictions (*see* former Code Crim Pro § 527 [1887]). In contrast, the jurisdiction of the Court of Appeals was restricted by limiting its factual review power and ability to examine errors in the interest of justice to only those cases that resulted in a sentence of

death (*see id.* § 528)—and those defendants were provided with a direct appeal to the Court (*see id.* § 517).[1]

Interpreting section 528 of the Code of Criminal Procedure, this Court observed that the powers conferred by the statute were "similar to those formerly given to this court in certain cases by chapter 337 of the Laws of 1855, as amended by chapter 330 of the Laws of 1858, and to the Supreme Court by section 527 of the Code of Criminal Procedure" (*People v Driscoll*, 107 NY 414, 417 [1887]). With regard to weight of the evidence review, the Court construed section 528 in a manner consistent with the approach that a verdict was presumed to be correct and would be overturned only if the record revealed that the jury's factual determinations were incorrect: "[t]his provision . . . requires us to review the facts in every capital case, and to determine whether, upon all of the evidence, there is, in our opinion, good and sufficient reason for setting aside the verdict of the jury and granting a new trial" (*id.*). If the record did not provide a "sufficient reason for disturbing the[ ] verdict," the conviction would not be reversed (*id.* at 421).

This remained the standard for conducting weight of the evidence review at the turn of the twentieth century (*see e.g. People v Place*, 157 NY 584, 596 [1899]; *People v Kennedy*, 159 NY 346, 354 [1899]; *People v Filippelli*, 173 NY 509, 514 [1903]), and when this Court decided *People v Gaimari* (176 NY 84 [1903])— the precedent cited by the Appellate Division in this case. After recounting the evidence adduced at Gaimari's trial, the Court provided the following explanation for rejecting his challenge to the weight of the evidence supporting the jury's verdict:

> "[E]nough has been said to show that the question as to the defendant's guilt, as to the grade of his offense if he was guilty, as to his claim that he acted in self-defense or that the homicide was the result of accident, were for the jury. They could look into the faces of the various witnesses as they gave their versions of the transaction and decide, so far as human judgment can tell, not only who intended to

---

1. In the following decade those statutory protections for capital defendants were incorporated into the Judiciary Article of the State Constitution of 1894, where they remain to this day (*see* 1894 NY Const, art VI, § 9, renum as art VI, § 7 in 1925, repealed and reratified as art VI, § 3 in 1962). The Constitution of 1894 also created the Appellate Division of Supreme Court as the new intermediate appellate court, with jurisdiction that had previously been conferred on Supreme Court (*see* 1894 NY Const, art VI, § 2).

speak the truth, but who in fact spoke the truth. Representing the average judgment of mankind, they could separate the true from the false with a degree of accuracy which, according to the theory of our law founded on the experience of many generations, cannot be attained by reviewing judges. The memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by those who see and hear than by those who simply read the printed narrative.

"Clearly the case was for the jury to decide and we cannot say that their verdict was against the weight of evidence or against law or that justice requires a new trial" (*id.* at 94).

The *Gaimari* decision represented one of the earliest discourses by this Court of the policy justifications for deferring to a jury's determination of the facts when examining the weight of the evidence. Yet there was no discussion regarding the effect that this deference would have upon the Court's ability to review the jury's factual findings.

Although *Gaimari* did not expressly indicate that the Court was foreclosed from reviewing the jury's resolution of conflicting evidence, other contemporaneous decisions could be read to suggest that this Court would not second-guess a verdict unless it was convinced that a conviction was manifestly unjust. For instance, in *People v Silverman* (181 NY 235, 240 [1905]), the Court explained that on previous occasions it had considered its powers under section 528 of the Code of Criminal Procedure and "uniformly [ ] held that it is not in the province of the court to review or determine controverted questions of fact arising upon conflicting evidence, but that the jury is the ultimate tribunal in such cases, and that with its decision this court cannot interfere unless it reaches the conclusion that justice has not been done" (*see also People v Boggiano*, 179 NY 267, 270 [1904]; *People v Filippelli*, 173 NY at 514; *People v Kennedy*, 159 NY at 354; *People v Decker*, 157 NY 186, 195 [1898]). In other situations, the Court attempted to strike a balance between the factual review mandated by section 528 of the Code of Criminal Procedure and *Gaimari*'s recognition of the vital role that jurors play in the criminal justice system (*see e.g. People v Sanducci*, 195 NY 361, 367 [1909] [noting that although

the "credibility of witnesses is necessarily for the twelve jurors who looked into their faces and heard them testify rather than for the seven judges who simply read the printed record of what they said," the Court had to "determin(e) whether the evidence fairly and reasonably supports their conclusion upon each of those questions"]).

This debate regarding the Court's ability to reexamine a jury's resolution of conflicting evidence was resolved in *People v Becker* (210 NY 274 [1914]). The Court endorsed the *Gaimari* principle and stressed that weight of the evidence review

> "does not mean that we are to take the place of the jury in passing upon those ordinary questions of the reliability of witnesses and of the credibility of testimony which constantly arise in trials or that we are to overturn the verdict simply because as an original proposition we might have reached a different result" (*id.* at 288).

Despite this level of deference, the Court stated that the statute placed upon the courts the "absolute duty of deciding whether a verdict in a murder case is against the weight of evidence" (*id.* at 289), which required it to determine

> "whether, taking into account the undisputed and clear infirmities of the People's witnesses and case, we believe that there is still left such a preponderating weight and balance of apparently worthy testimony as justified the jury in finding that the affirmation of the defendant's guilt was . . . unclouded by the shadow of any reasonable doubt" (*id.* at 288-289).

In the seminal case of *People v Crum* (272 NY 348 [1936]), the Court ultimately adopted the standard that a conviction would be upheld only if the Court affirmatively reviewed the record and determined that the evidence supported the jury's resolution of competing factual inferences. The Court concluded that under section 528 of the Code of Criminal Procedure:

> "We are obliged to weigh the evidence and form a conclusion as to the facts. It is not sufficient, as in most of the cases with us, to find evidence which presents a question of fact; it is necessary to go further before we can affirm a conviction and find that the evidence is of such weight and credibility as to convince us that the jury was justified in finding the

defendant guilty beyond a reasonable doubt" (*id.* at 350).

*Crum* also emphasized that, consistent with *Gaimari*, "this court should not readily interfere with verdicts of jurors who have had the advantage of seeing and hearing witnesses" in conducting the weight of the evidence analysis (*id.* at 357). Thus, *Crum* struck a balance between the earlier, competing views for examining weight of the evidence: an appellate court had to affirmatively review the record and undertake an independent assessment of the evidence to determine whether the jury's verdict was factually correct (similar to the *"res nova"* principle referred to in *Ferris*), but, at the same time, give due deference to the factfinder's resolution of witness credibility and conflicting evidence.

For decades, this Court repeatedly referenced *Crum* as the proper standard to be utilized in addressing weight of the evidence challenges (*see e.g. People v Higgins*, 5 NY2d 607, 626 [1959]; *People v Williams*, 292 NY 297, 300 [1944]). With the adoption of the Criminal Procedure Law in 1970, the Legislature retained the statutory authority for the Appellate Division to review the weight of the evidence in all criminal cases (*see e.g.* CPL 470.20 [5]) and, consistent with the State Constitution (*see* NY Const, art VI, § 3), for this Court to do so in cases where a death sentence is imposed (*see* CPL 470.30 [1]). But this recodification did not alter the existing scope of weight of the evidence review, and *Crum* was cited approvingly by this Court in two capital appeals that followed enactment of the Criminal Procedure Law, *People v Davis* (43 NY2d 17, 36 [1977]) and *People v Smith* (63 NY2d 41, 52 [1984]).

Then, in 1987, this Court decided *People v Bleakley* (69 NY2d 490 [1987]), refining the standard for weight of the evidence review consistent with the core principles of *Crum*. We articulated a two-step approach that requires courts to first determine whether, "based on all the credible evidence[,] a different finding would not have been unreasonable" (*id.* at 495). If it would have been reasonable for the factfinder to reach a different conclusion, "then the appellate court must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony'" (*id.*, quoting *People ex rel. MacCracken v Miller*, 291 NY 55, 62 [1943]). If this review of the record leads the court to conclude that "the trier of fact has failed to give the evidence the weight it should be accorded,

then the appellate court may set aside the verdict" (*People v Bleakley*, 69 NY2d at 495). We also stressed the same cautionary principle echoed in the *Gaimari* decision:

> "Empowered with this unique factual review, intermediate appellate courts have been careful not to substitute themselves for the jury. Great deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor. Without question the differences between what the jury does and what the appellate court does in weighing evidence are delicately nuanced, but differences there are" (*id.*).[2]

This remains the standard of review applicable today (*see e.g. People v Mateo*, 2 NY3d 383, 410 [2004]).

## III.

With this history in mind, we turn to defendant's contention that the Appellate Division's use of *Gaimari*, rather than *Crum, Bleakley* or one of our more recent decisions, demonstrates that the Court believed it was foreclosed from reviewing the jury's assessment of the witnesses' credibility and resolution of conflicting evidence, thereby employing an improper legal standard for conducting its weight of the evidence review. From a historical standpoint, we have always recognized that juries have a superior ability to "separate the true from the false with a degree of accuracy which, according to the theory of our law founded on the experience of many generations, cannot be attained by reviewing judges" (*People v Gaimari*, 176 NY at 94).

---

2. Despite these obvious distinctions, a court that undertakes this type of review has been analogized to a " 'thirteenth juror' " (*Tibbs v Florida*, 457 US 31, 42 [1982]). This is true in certain respects because courts, like juries, must resolve conflicting evidence and render a determination based on the elements as charged by the trial judge (*see e.g. People v Noble*, 86 NY2d 814, 815 [1995]; *People v Cooper*, 88 NY2d 1056, 1058 [1996]). However, there is a crucial distinction between the system described in *Tibbs* and the law in New York that makes our appellate courts function as, in effect, a second jury. *Tibbs* explained that if the hypothetical thirteenth juror disagrees with the other 12 jurors, the result would be a deadlocked jury, which would require a mistrial and allow the defendant to be reprosecuted, "not . . . an acquittal barring retrial under the Double Jeopardy Clause" (*Tibbs v Florida*, 457 US at 42). In contrast, our Legislature has erected a statutory bar preventing a defendant from being retried after a conviction is reversed based on the weight of the evidence (*see* CPL 470.20 [5]; Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 470.15, at 530; *id.*, CPL 470.20, at 670-671). Thus, when the thirteenth juror reaches a different conclusion than that of the jury, the effective result in New York is an acquittal rather than a mistrial.

Indeed, we have repeatedly recognized—in *Becker*, *Crum*, *Bleakley* and *Mateo*, among other decisions—that an appellate court must give "[g]reat deference" to the jury's verdict (*People v Bleakley*, 69 NY2d at 495) precisely because "[t]he memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by those who see and hear than by those who simply read the printed narrative" (*People v Gaimari*, 176 NY at 94). Thus, it cannot be said that the reference to *Gaimari* inherently indicates that an appellate court applied an outmoded standard of review.

Aside from this principle of deference, it is true that at the time *Gaimari* was decided there was precedent suggesting that the jury was "the ultimate tribunal" for resolving controverted questions of fact and that an appellate court should not interfere with a verdict "unless it reaches the conclusion that justice has not been done" (*People v Silverman*, 181 NY at 240; *see e.g. People v Decker*, 157 NY at 195). There was also conflicting case law as to whether section 528 of the Code of Criminal Procedure required reversal if the record revealed that the verdict was wrong, or whether the statute allowed a conviction to be affirmed only where a review of the evidence indicated that the jury's decision was correct (*compare People v Driscoll*, 107 NY at 417, *with People v Sanducci*, 195 NY at 367). *Gaimari*, however, did not purport to apply a standard similar to *Silverman* or *Driscoll* and the Court did not intimate that it was precluded from conducting an independent assessment of the record. In fact, the *Gaimari* decision reveals that the Court, after an extensive evaluation of the trial evidence, could "[ ]not say that [the jury's] verdict was against the weight of evidence" (176 NY at 94). In our view, this is no different than stating that it does not "appear[ ] that the trier of fact has failed to give the evidence the weight it should be accorded" (*People v Bleakley*, 69 NY2d at 495).

The Appellate Division recognized here that conflicting evidence was adduced at trial but, similar to the Court in *Gaimari*, concluded that there was "no basis for disturbing the jury's determinations" (22 AD3d at 287)—i.e., the record revealed that the verdict was supported by the facts—a statement that under *Crum* and *Bleakley* provided sufficient predicate to reject defendant's challenge. The Court further explained that "[n]umerous witnesses inculpated defendant[ ], and the jury could have reasonably concluded that differences in their percep-

tion and memory of details of this fast-paced, chaotic event accounted for the inconsistencies" (*id.*). In light of those facts, the Court's affirmance was consistent with the deference principle of *Gaimari* and *Bleakley*.

Moreover, the Appellate Division's explanation was certainly adequate to justify the rejection of defendant's argument. We indicated in *Bleakley* that the Appellate Division is not required to "manifest its weight of evidence review power by writing in all criminal cases" (69 NY2d at 496). The Court here could have summarily affirmed without explicitly addressing the merits of defendant's challenge to the weight of the evidence. Had it done so, defendant would have had no recourse to this Court because it is only "where the order and writings of the intermediate appellate court manifest a lack of application of that review power" that we must reverse and remit for a proper assessment of the weight of the evidence (*id.*). Because we conclude that the Appellate Division's review was not improper, we affirm.

We nevertheless recognize, as our analysis indicates, that the judiciary struggled to identify the parameters of weight of the evidence review at least until *People v Becker* (210 NY 274 [1914]), which disavowed the *Silverman* formulation that treated jury verdicts as virtually inviolable, and *People v Crum* (272 NY 348 [1936]), which manifested a definitive, lasting principle of law. This evolution suggests that to prevent confusion, exclusive reliance on cases from that early era should be avoided. Where the Appellate Division determines that an explanation of its legal reasoning is preferable, the better practice, after conducting weight of the evidence review, would be for the Court to reference more contemporary precedent, such as *Bleakley* or *Mateo*. By doing so, courts will make absolutely clear that a defendant has received the appellate scrutiny that the Criminal Procedure Law requires.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT, READ, SMITH and PIGOTT concur.

Order affirmed.