(April 8, 2014)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NORMA WHATTS, Appellant. [983 NYS2d 253]—

Judgment, Supreme Court, Bronx County (Robert K. Holdman, J.), rendered June 30, 2011, convicting defendant, after a nonjury trial, of attempted assault in the third degree, harassment in the second degree and two counts of disorderly conduct, and sentencing her to a conditional discharge, affirmed.

Defendant brings a weight of the evidence challenge to her conviction of various offenses relating to resisting arrest. The People's and the defense witnesses' accounts begin somewhat consistently, but diverge completely at the point of defendant's husband's arrest. The People's witnesses describe escalating violence at this point in time, with defendant's husband cursing at an officer who stopped him on the street, and defendant approaching the encounter screaming at the police, resisting her own arrest and attempting to assault her arresting officer. By contrast, the defense testimony paints a picture of an unlawful arrest of defendant's husband, followed by defendant calmly offering her hands to be arrested, without resisting, attempting an assault, or engaging in disorderly conduct. The defense witnesses testified that defendant was an innocent victim of unprovoked police brutality. By its verdict, explained at sentencing, the trial court accepted the People's version and found defendant's account incredible. The trial testimony was as follows.

Police Officers Doigenes Escano, Yurantz Assade, and Henry Adames each testified that they were on patrol in a marked police van, and pulled over when they saw a group of people drink-

ing on the sidewalk outside a building. Assade, who was driving, stayed in the van, and as Escano and Adames approached the group, one man began running down the block. The two officers chased but did not apprehend him. Assade followed in the van. Escano arrested a second man, later identified as Jose Flores, who was also running up the block, upon finding that he possessed a gravity knife and a bag of marijuana. He was placed in the van, and Assade drove Adames and Escano back to the building.

Once there, Escano stayed in the van with Flores, and Adames and Assade canvassed the location for contraband. Adames directed a group gathered on the sidewalk to leave the area. Everyone except Javier Rivera, defendant's husband, complied. Adames and Escano testified that when Adames asked Rivera for his identification, Rivera cursed and refused, even after being warned that he could be arrested for disorderly conduct. Adames and Assade felt it best to deal with Rivera at the station because a crowd was gathering. Adames handcuffed Rivera and led him to Assade, to be placed in the van. Escano testified that when Flores saw Rivera arrested, he started acting up, kicking the inside of the van's door and window.

Assade and Adames testified that defendant then came toward them, shouted an obscenity, and yelled: "You got the wrong guy." Adames testified that he told defendant to back up, or, that if she wanted, she could come to the precinct and he would explain to her why Rivera was arrested. Adames testified that defendant kept screaming and cursing, and when he finished putting Rivera in the van, defendant "pulled [him] by the left shoulder and punched [him] on the left side of [his] face" with a closed fist. The other two officers did not see defendant punch Adames. However, Assade testified that later he asked Adames what happened to his face because it "was reddish and swollen."

Adames testified that right after being punched, he grabbed defendant's right arm to arrest her. She was resisting—flailing her arms and kicking her legs. The crowd was growing. Adames was able to place one handcuff on defendant, but she clutched his leg with her free hand. Adames grabbed defendant's shirt from behind, and tripped her, so that she fell to the ground. People in the surrounding buildings started throwing things out of windows at the officers, including a bowling ball and a dumbbell. More than 30 people had gathered, and some of them were shaking the police van. Officers from two different precincts were called to assist.

When backup arrived, defendant was fully handcuffed, and

she told Adames that "she was going into a seizure." Assade called an ambulance, and defendant was taken to the hospital. After the incident, Adames also went to the hospital. The parties introduced medical records and photographs of Adames into evidence. The photographs are not in the appellate record, but Adames testified that they showed that the side of his face was red and swollen.

Assade did not recall whether defendant was kicking or flailing her arms so as not to be handcuffed. In a 30-second silent amateur video introduced by the defense, defendant is seen struggling with the officer identified at trial as Adames, with her legs moving. At trial, Assade testified that he first observed the interaction between defendant and Adames when he "got pushed in the back."[1] At trial, Assade testified that after he gave Rivera to Escano in the van: "I turned around and Adames had one handcuff on [defendant]. And then I turned around a little further, I saw [a] group coming down the block so I picked up my radio and I called for help. And, at that time, the group started, like being real tumultuous. They were trying to get to us. They were trying to get to Adames. So I had to grab them and push them back into the sidewalk and told them to get back." Assade did not see Adames step on defendant or flip her to the ground.

The defense consisted of the testimony of defendant and three witnesses. Julio Nunez related that he was outside the building with defendant, Rivera, Victoria Morales, and others when a police van approached. Two individuals ran up the block, and the van went after them. The van then returned. Defendant's husband had begun walking down the street to buy a pack of cigarettes when three police officers "hopped out" and arrested him for no reason. Nunez testified that defendant walked[2] over to the police, and asked why they were arresting her husband. One officer (whom he identified as Adames) used obscene language and told defendant to step back or she would be arrested. Defendant did not get upset, but instead turned around and offered her hands behind her back. Nunez saw two other officers on the street outside the police van.

The next thing Nunez saw was that Adames grabbed defend-

---

**1.** On cross-examination, defense counsel confronted Assade with prior deposition testimony before the Civilian Complaint Review Board (CCRB) in which he did not mention being pushed. Before the CCRB, Assade testified that the first thing he observed was Adames with one handcuff on defendant, who was on the ground.

**2.** On cross-examination Nunez testified that defendant was either jogging or running.

ant by her right arm, put the cuff on that arm, and "just swept her by her feet [and] tripped her real hard and dropped her to the floor." Defendant was screaming; all three police officers were "jumping on her and kicking her." People in the area started getting mad, and started throwing things. Nunez testified that the police officers called for backup and when it arrived, he started running so that he would not be arrested.

Zinia Negron next testified that she was talking to defendant in the area outside their building when a "patty wagon" (sic) came up and a few police officers exited the vehicle. She went inside the building. About 15 minutes later, from her window, she saw a police officer throwing defendant to the ground. Negron ran downstairs to help, but police officers were blocking the area.

Victoria Morales also testified that she was with defendant and Negron when the police van arrived. She saw defendant's husband walking to the store, and getting stopped and arrested by three or four police officers. Morales saw defendant calmly approach the police. Morales said that after being warned to step away, defendant turned her back, and offered her hands to be handcuffed. Morales saw an officer swing defendant around, throw her to the ground, and stomp on her chest approximately three times. Defendant was screaming because her foot was stuck between a car wheel and the sidewalk. Six or seven police officers were around defendant, and although she was convulsing on the ground, nobody put anything under her head. Morales called out that defendant was having a seizure, and someone should call for an ambulance. Morales was also filming the incident. She testified that officers ordered her arrested because she had a camera. She testified that the police erased her video at the precinct.

On cross-examination, Morales acknowledged that the police had found two bags of marijuana in the back seat of the police vehicle that transported her to the precinct. She also revealed that she had a pending lawsuit against the City of New York alleging that she had been falsely arrested as a result of this incident.

Finally, defendant testified on her own behalf. She recalled that as her husband was going to get cigarettes, he was approached by two police officers and arrested. She walked with Morales and Nunez toward her husband and the police officers. Adames told defendant to step back, and she complied. She was calm; just had some questions. After her husband had been transferred from Adames to another officer, she continued to ask why he was being arrested. Because the police refused to

give her a reason for her husband's arrest, she peacefully offered to be arrested too. She turned around, and placed her hands behind her back to be handcuffed. She did not punch, push or make any physical contact with officer Adames or any of the other officers.

Defendant testified that Adames handcuffed her right hand, and before he handcuffed her left hand, "swept [her] backwards from [her] foot" and "hit the back of [her] head." She did not flail her arms, kick her legs or do anything to make it difficult for Adames to put the other handcuff on her. Once Adames pulled her between the two parked cars, he stomped on her foot and she felt it break. She was screaming, and Adames told her, in Spanish, to stop faking and get up. Adames continued to stomp on her. He then put his foot on her chest and only removed it when he noticed that she could not breathe. Although Adames was the only police officer assaulting her, she saw officers Assade and Escano standing nearby. She was taken by ambulance to the hospital. She had suffered a broken left foot.

Defendant confirmed that she gave a statement to the Internal Affairs Bureau (IAB) approximately eight hours after the incident that conflicted with her trial testimony about calmly offering her hands to be arrested. In the IAB statement defendant claimed that Adames had told her to shut up or she would be arrested. She asked "for what purpose," and Adames "grabbed [her] arm and [ ] put the handcuffs on [her], and with a very large force, swung [her] over and swung [her] over on [her] back, which [she] moved with him." Defendant confirmed that she has a pending civil case against the City for her injuries.

The court found defendant guilty of: (1) attempted assault in the third degree; (2) disorderly conduct (two counts); and (3) harassment in the second degree. The court found defendant's testimony regarding her demeanor at the scene "incredible and unbelievable." It also found that the videotape introduced by the defense corroborated the police officers' account because it showed "mayhem" at the scene.

"You could see in [the officers'] faces that they were in fear. And the fact that [Assade] did not see or some [sic] doesn't see what may have been going on with the defendant is because they're looking up at the crowd . . . they almost look like they are in a battle scene with their hands on their head and swivel [sic] going back and forth with backs up against the van . . .

"So when the defendant placed herself in the middle of the officers effectuating the [allegedly] unlawful arrest, she is what started the mayhem. She is what caused all that ruckus and all

that dangerous activity, not only the police officers' safety but the public. And she is what ended up causing her own injury."

We reject defendant's contention that her conviction was against the weight of the evidence. "[W]eight of the evidence review requires a court first to determine whether an acquittal would not have been unreasonable. If so, the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based upon the weight of the credible evidence, the court then decides whether the [factfinder] was justified in finding the defendant guilty beyond a reasonable doubt" (*People v Danielson*, 9 NY3d 342, 348 [2007]). Weight of the evidence review is identical regardless of whether the factfinder was a judge, as here, or a jury (*People v Lane*, 7 NY3d 888, 890 [2006]). We find, upon independent review of the trial record that the court's conviction was supported by the credible evidence.

On issues of pure credibility, we must accord deference to the factfinder because "[t]he memory, motive, mental capacity, accuracy of observation and statement, truthfulness and other tests of the reliability of witnesses can be passed upon with greater safety by those who see and hear than by those who read the printed narrative" (*People v Romero*, 7 NY3d 633, 645 [2006] [internal quotation marks omitted]). Here, the court found defendant incredible, and inconsistent with the video introduced by the defense, which depicts a short period of time after Adames handcuffed defendant. The video shows defendant on her back with one hand cuffed, her feet raised above the bumper of a nearby parked car and screaming, which is consistent with Adames's testimony that defendant was screaming, flailing and generally resisting arrest. It also shows that there were two officers outside of the police van in a defensive position, not six or seven, as testified by Morales.

Defendant and the dissent find fault with the fact that none of the other police officers was able to corroborate Adames's account that defendant was resisting arrest or attempted to punch him. However, none of the People's witnesses saw defendant calmly offering herself to be arrested, and all of the officers testified that the crowd was growing and chaos escalating before defendant was arrested. The court believed Assade's testimony that he was not focused on the interaction between Adames and defendant because the scene was chaotic, with a large crowd surrounding the police van, yelling, screaming and throwing things, and requiring backup officers to be called. There is no basis for disturbing this conclusion, and none of defendant's witnesses testified otherwise. Escano, who was in the van, testi-

fied that his charges were "kicking the door," "kicking the window" and generally "getting out of control in the vehicle." We accept his testimony that this was his main focus, rather than events occurring outside the van.

There was a rational basis for the court's finding that defendant's account was incredible. A spouse's arrest would naturally evoke emotion, but defendant was adamant that she was not emotional when she approached the police. She testified that she remained calm upon not being told why her husband was being arrested, that she complied with all of the officer's directives to back up and then volunteered herself for arrest by turning around and placing both her hands behind her back. However, it is uncontoverted that Officer Adames placed only one handcuff on her. The chaos of the video is also consistent with the testimony of the People's witnesses.

Finally, we reject defendant's claim that she has been deprived of meaningful appellate review based upon the People's failure to preserve and maintain the photographs of Adames's face taken after the incident, since she has not demonstrated that she was prejudiced by the absence of these exhibits (see People v Roper, 235 AD2d 326 [1st Dept 1997], lv denied 89 NY2d 1100 [1997]). The court accepted Adames's testimony that defendant struck him in the face as she resisted arrest, and it rejected, as incredible, defendant's testimony to the contrary. The photographs were sufficiently described in the trial record, and, in any event, were not decisive evidence of any element of defendant's conviction. Defendant was convicted of attempted assault in the third degree, which does not require a showing of "physical injury." Concur—Gonzalez, P.J., Tom, Saxe and Gische, JJ.

Manzanet-Daniels, J. dissents in a memorandum as follows: I would find the verdict to be against the weight of the evidence, and reverse. "[A]n acquittal would not have been unreasonable" in view of the conflicting testimony and the lack of evidence establishing defendant's guilt beyond a reasonable doubt (People v Danielson, 9 NY3d 342, 348-349 [2007]).

On October 19, 2007, officers from the "conditions" team at the 41st precinct observed a group of people drinking in public, defendant's husband among them. As the arresting officer and his partner escorted defendant's husband to a nearby police van, defendant emerged, shouting to the officers that they "got the wrong guy."

The arresting officer testified that defendant pulled him by the left shoulder and punched him on the left side of the face. He testified that he grabbed defendant's arm and proceeded to place her under arrest for assaulting a police officer. He cuffed

one of her hands, but was unable to cuff the other because she was flailing and kicking. According to the officer, defendant "was going wild and she was screaming so hard that a crowd started forming" around them.

The arresting officer testified that he "grabbed" defendant's shirt from behind and "trip[ped]" her with his leg in order to maneuver her to the ground and effectuate the arrest. According to the officer, defendant grabbed his leg with her free arm and "wouldn't let go."

The arresting officer's partner, though standing next to him, was unable to corroborate his partner's testimony that defendant punched him or otherwise resisted arrest.* Neither he, nor the officer inside the van, observed defendant strike the arresting officer or otherwise assault him, though both officers were in close proximity and in a position to observe what was transpiring.

Defendant testified that she approached the officers and asked them why they were arresting her husband. She complied with the officer's directive to step back, but continued asking why her husband was being placed under arrest. The officer told defendant to "step the f . . . back." He said he would have to arrest defendant as well for interfering, and defendant replied "I guess you're going to have to arrest me."

Defendant testified that she turned around and placed her hands behind her back. The officer grabbed defendant's right arm, placed the cuff on her right hand, put his foot behind her foot, and "flipped" her, tripping her backward and causing her to fall to the ground. The officer then dragged her, screaming, from the sidewalk to a space in between two parked vehicles.

While defendant was lying on the ground between the two vehicles, the officer stomped on her foot, which she immediately felt break. She screamed, but the officer yelled at her in Spanish to stop "faking." He then kneed her on the back and stomped on her chest, only removing his foot when he noticed that she was unable to breathe.

Defendant testified that at no point did she punch the officer,

* The officer testified at trial that he observed his partner "struggle" with defendant. However, in earlier testimony before the Civilian Complaint Review Board, he testified that when he turned and first observed defendant, she had one knee on the ground, with one hand cuffed (i.e., the position in which defendant is observed in the video that was introduced into evidence). The officer inside the van told the Civilian Complaint Review Board only that he observed defendant speaking to the two officers outside of the van. Yet, at trial he maintained that he was focused on the two prisoners in the van to the exclusion of all else transpiring outside, including, allegedly, a near riot.

flail, kick, or resist being handcuffed, testimony corroborated by the other witnesses at the scene. Witnesses observed the arresting officer throw defendant to the ground, drag her to the curb and stomp on her chest. A video introduced into evidence shows defendant, on the ground, being held and dragged by one cuffed hand by the arresting officer, with his partner standing right beside him, belying any notion that he was not in a position to have observed what was transpiring, and calling the credibility of both officers into question (*see People v Ortiz*, 99 AD3d 596 [1st Dept 2012] [verdict against the weight of the evidence where the victim's testimony was inconsistent with the documented conduct of the defendant]).

One of the other officers, observing defendant shaking and having what appeared to be a seizure, called EMS. Defendant was taken away from the scene via ambulance. Although the arresting officer, by his own admission, was engaged with defendant on the ground, eventually succeeding in cuffing her, he testified that he did not observe her shaking or having a seizure.

Defendant's medical records state that she sustained "blunt trauma to the dorsum of her left foot," causing a "Lisfranc injury between the first and second metatarsals as well as the medial and middle cuneiform." She later underwent two surgeries, the first of which required that she use crutches for a period of 16 weeks.

The Sprint report of a radio run indicated "[n]o MOS [member of service] injured, injured female at location." The officer's medical records from the evening state that he suffered only a superficial skin abrasion. Photos allegedly depicting the extent of the officer's injuries were misplaced by the prosecution, and are currently irretrievable.

I would find the verdict to be against the weight of the evidence, and reverse. Defendant testified that she never struck, pushed or made any physical contact with the arresting officer, testimony which was corroborated by the video and the defense witnesses, and consistent with the testimony of the other officers on the scene, who were in a position to have observed the encounter, yet failed to witness physical violence. Defense witnesses testified that the officer threw defendant on the ground and stomped on her repeatedly, which would explain the nature and the extent of defendant's injuries (*see Matter of Edward F.*, 154 AD2d 464, 465 [2d Dept 1989] [evidence of appellant's injuries showed officer's motive to lie and was "directly probative of credibility" in a case where it was claimed that the appellant had struck an officer, and the appellant alleged, on the other hand, that the officers had fabricated the story in an at-

tempt to cover up their own misconduct in striking him with their nightsticks]).

The only evidence contradicting defendant's account was that of the arresting officer. But the evidence at trial revealed the officer's testimony to be incredible, a conclusion supported by defendant's medical records documenting a fracture of the foot and the video which captured part of the incident. Further, the officer had a strong motive to lie, since defendant's injuries had become the subject of both a civil lawsuit against the City and a New York City Civilian Complaint Review Board investigation.