People v Delvalle (2024 NY Slip Op 03896)

People v Delvalle

2024 NY Slip Op 03896

Decided on July 24, 2024

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on July 24, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

VALERIE BRATHWAITE NELSON, J.P.
JOSEPH J. MALTESE
DEBORAH A. DOWLING
HELEN VOUTSINAS, JJ.

2006-01147
 (Ind. No. 792/04)

[*1]The People of the State of New York, respondent, 
v
Christian Delvalle, appellant.

Patricia Pazner, New York, NY (Lynn W. L. Fahey and David Fitzmaurice of counsel), for appellant.
Melinda Katz, District Attorney, Kew Gardens, NY (Johnnette Traill, Charles T. Pollak, and Jaedon J. Huie of counsel), for respondent.

DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Queens County (Daniel Lewis, J.), rendered January 19, 2006, convicting him of robbery in the third degree, assault in the third degree, unlawful imprisonment in the second degree, and criminal impersonation in the second degree, after a nonjury trial, and imposing sentence.
ORDERED that the judgment is reversed, on the facts, the indictment is dismissed, and the matter is remitted to the Supreme Court, Queens County, for further proceedings consistent with CPL 160.50.
In the early morning hours of November 29, 2003, the complainant and his friend chased the defendant down a dark street in Queens, believing him to be the person who earlier had stolen the complainant's wallet. The complainant beat the defendant until he was bleeding so profusely that the blood covered the complainant as well as the defendant and the defendant needed to be transported to a hospital to be treated for his injuries. The defendant did not have the complainant's wallet in his possession and was wearing a sweater of a different color than the shirt the perpetrator was identified as wearing. No physical evidence tied the defendant to the theft. Nonetheless, based upon the identification testimony of the complainant and his friend, the defendant was convicted of robbery in the third degree and other crimes relating to the theft incident. Upon the exercise of our factual review power (see CPL 470.15[5]), we find that the defendant's identity as the perpetrator was not established beyond a reasonable doubt. We, therefore, reverse the judgment of conviction, dismiss the indictment, and remit the matter to the Supreme Court, Queens County, for further proceedings consistent with CPL 160.50.
The evidence adduced at the nonjury trial established that in the early morning of November 29, 2003, the complainant and his friend left a bar in Queens, where they had been drinking for approximately three hours, and went to a taco stand. There, the complainant became engaged in a fight with another man on the street near the taco stand. The complainant was on the ground on top of the other man, fighting him, when another man (hereinafter the thief) approached from behind, removed the complainant's wallet from his pants pocket, and walked away towards a Lincoln car (hereinafter the Lincoln). The complainant got up and followed the thief. At the [*2]Lincoln, the complainant grabbed the thief, started pulling him, and attempted to take back his wallet. Two other men emerged from the Lincoln and claimed that they were police officers, which caused the complainant to release the thief from his grip. The men displayed a radio with an antenna. The complainant decided that they were not police officers and again grabbed the thief who had taken his wallet. During the struggle, the complainant was pushed and pulled into the backseat of the Lincoln and the Lincoln drove away. The incident occurred in a dark area that was under elevated train tracks.
The complainant's friend and a taxicab driver witnessed the incident. The taxicab driver described the thief as wearing jeans and a white shirt. The friend got into the taxicab and the taxicab driver and the friend pursued the Lincoln. The friend wrote down the number of the license plate, which was from North Carolina. They traveled approximately 10 blocks, going through red lights and stop signs, for approximately 15 minutes. Inside of the Lincoln, the complainant was forced to keep his head down between his knees and the two men on either side of him hit him about the head and back with something very hard. The driver of the Lincoln said that a taxi was following and, thereafter, the complainant was forced out of the Lincoln. The complainant then entered the taxicab and the taxicab continued its pursuit of the Lincoln.
According to the taxicab driver, the chase continued for approximately 10 more minutes and 15 additional blocks until the Lincoln went through a red light with traffic coming from both directions, causing the taxicab to stop and the taxicab driver to lose sight of the Lincoln, never to see it again. The taxicab driver drove the taxicab in the direction that the Lincoln had gone and either the complainant or his friend told the taxicab driver to stop because he had seen one of the men from the Lincoln. The taxicab stopped and the complainant and his friend exited the taxicab and ran down a one-way street that the taxicab could not enter. The taxicab driver, who had already lost work due to the incident, drove away. After driving approximately eight blocks, however, the taxicab driver returned because he was curious as to what was happening. He saw two people fighting on the sidewalk, one of whom was covered in blood.
A police officer responded to the scene and observed the defendant and the complainant lying on the ground. The officer observed a significant amount of blood on the defendant's face, clothes, and arms. The defendant had lacerations, bruises, and swelling to his face and head and was bleeding from his head. The defendant told the officer that he had been coming from a union party when he was accosted by the complainant and his friend. The defendant was wearing a black sweater, blue jeans, brown boots, and a white t-shirt. The defendant was placed under arrest and taken to a hospital to be treated for his injuries. The defendant did not have the complainant's wallet, any items belonging to the complainant, or a radio in his possession. The defendant was in possession of his own wallet, cell phone, a key, and a gold watch, which were returned to a relative following the defendant's arrest. The People presented no further evidence concerning the Lincoln with North Carolina license plates or any physical evidence tying the defendant to the scene near the taco stand.
In contrast to the taxicab driver's testimony, the complainant testified that after he entered the taxicab, it remained very close, "practically bumper to bumper," to the Lincoln and that he never lost sight of the Lincoln. The complainant's friend also testified that he did not lose sight of the Lincoln, yet neither the complainant nor his friend could definitively recall the color of the Lincoln. The complainant testified that, after driving around, sometimes traveling the wrong way on certain streets, the Lincoln stopped, and the defendant exited, looked towards the taxicab, and ran. The complainant identified the defendant as the thief who had taken his wallet and who he and his friend had pursued for approximately two blocks before catching him. The complainant testified that the defendant took a fighting stance and threw punches at the complainant but missed. The complainant punched the defendant, threw him to the ground, and a fight ensued. The complainant "took advantage of the fact that [the defendant] was on the ground" to hit him until he "felt . . . all the blood . . . because it was falling coming out of [the defendant]" and onto the complainant and his clothes. The complainant admitted that he beat the defendant "pretty badly," as he "kn[e]w how to fight, because [he had] been training for many years." The complainant also admitted that the defendant was screaming for help and that the complainant's friend told him to stop hitting the [*3]defendant, but the complainant continued to hit the defendant because he did not know whether or not the defendant had his wallet. The complainant never recovered his wallet.
In summation, the defense argued that the complainant mistakenly identified the defendant as the person who had taken his wallet earlier that morning and then fabricated details in order to avoid prosecution for brutally assaulting an innocent man. The Supreme Court convicted the defendant of robbery in the third degree, assault in the third degree, unlawful imprisonment in the second degree, and criminal impersonation in the second degree, and imposed sentence.
In determining whether a conviction is against the weight of the credible evidence, this Court is required to first determine whether an acquittal would not have been unreasonable (see People v Danielson, 9 NY3d 342, 348; People v Romero, 7 NY3d 633, 643). If an acquittal would not have been unreasonable, then this Court "must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Based on the weight of the credible evidence, the court then decides whether the [factfinder] was justified in finding the defendant guilty beyond a reasonable doubt" (People v Danielson, 9 NY3d at 348; see People v Romero, 7 NY3d at 643-644).
Here, an acquittal would not have been unreasonable since the defendant did not possess the complainant's wallet, no physical evidence tied him to the scene of the theft or to the Lincoln in which the complainant had been abducted, and the clothing that the defendant was wearing did not match the description of the perpetrator's clothing. Moreover, upon the exercise of our factual review power (see CPL 470.15[5]), we find that the rational inferences that can be drawn from the trial evidence do not support the convictions beyond a reasonable doubt. Initially, while the People speculate that the defendant could have put on the sweater at some time after he stole the complainant's wallet, by the complainant's version of events, the defendant was either engaged in a struggle with the complainant or under the constant watch of the complainant and his friend from the moment of the theft. Furthermore, the taxicab driver candidly admitted that he lost sight of the Lincoln and never saw it again, which cannot be reconciled with the complainant's testimony that the two vehicles were "bumper to bumper" the entire time the taxicab followed the Lincoln.
The testimony of the complainant and his friend that they saw the defendant exiting the Lincoln cannot be credited. Our dissenting colleague posits that the taxicab driver's testimony lacked credibility because of certain comments made by the Assistant District Attorney during an application to the Supreme Court for an order of protection. Statements by an attorney, however, are not evidence and cannot be relied upon as such. In any event, the court denied the application as lacking any basis in fact or law, noting that there had been no interactions between the defendant and the taxicab driver. Furthermore, nothing in the record suggests that the taxicab driver was untruthful in his testimony. To the contrary, the record supports a finding that he testified credibly. Moreover, unlike the complainant, who had badly beaten the defendant, the taxicab driver had no motive to testify untruthfully.
The testimony of the complainant and his friend suffered other credibility issues. Throughout the events of the early morning, which took place between 4:00 a.m. and 5:00 a.m. in the month of November, the complainant and his friend claimed that at multiple locations the light was excellent and that they were able to see the defendant's face clearly. Although the complainant fought three times that night—first with one of the men from the taco stand, then with the three men by the Lincoln, and finally with the defendant—in each case the complainant identified the other party as being at fault. However, the complainant was the one who threw the punches and was the person on top of the other party on the ground. As to the defendant, the complainant admitted that he beat the defendant badly, he ignored his friend's pleas to stop, and the defendant was calling for help. As the defense argued at trial, the complainant had a strong motive to attempt to establish that the defendant was the person who took his wallet, inasmuch as the complainant otherwise would have to admit that he had badly beaten an innocent man who, on his way home from a union party, was mistaken on a dark street for someone else. Under the circumstances, we find that the evidence is insufficient to establish, beyond a reasonable doubt, the defendant's identity as the perpetrator (see People v Hawkins, 196 AD3d 505, 507; People v Garcia, 194 AD3d 956, 959; People v Mann, 184 [*4]AD3d 670, 672; People v James, 179 AD3d 1095, 1096-1097).
In light of our determination, we do not address the defendant's remaining contentions.
BRATHWAITE NELSON, J.P., DOWLING and VOUTSINAS, JJ., concur.
MALTESE, J., dissents, and votes to affirm the judgment, with the following memorandum:
I respectfully dissent and vote to affirm the judgment of conviction. In my view, although an acquittal would not have been unreasonable in this case (see People v Romualdo, 215 AD3d 692; People v Taverez, 155 AD3d 783), the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633).
At the nonjury trial, the People presented the testimony of the complainant, his friend Felix Ramirez, and Nestor Mora, a taxi driver, among others. The complainant and Ramirez testified that in the early morning hours of November 29, 2003, they were at a taco stand when three men began arguing with them. The argument escalated and resulted in a physical altercation. During the altercation, the complainant was on the ground and he felt someone remove his wallet from his back pants pocket. He then observed the defendant walking away from him toward a vehicle. Ramirez observed the defendant touch the complainant's back, heard the complainant say "my wallet, my wallet, my wallet" and ask for the wallet back, and then saw the defendant and the complainant "tugging at one another." Although the altercation took place in the dark early morning hours, both the complainant and Ramirez testified that the area was well lit by streetlights and lights from nearby business establishments.
The complainant observed the defendant holding his wallet and attempted to take the wallet back. The defendant and one of two men near the vehicle said that they were police officers. However, the complainant realized that the men were not police officers and so resumed struggling to retrieve his wallet. The defendant and the two other men pushed the complainant into the vehicle, where they hit the complainant's head and back. Mora, who was driving by in his taxi, saw two men grabbing at each other and then saw one of the men put the other into the rear seat of a vehicle. Ramirez entered Mora's taxi and Mora followed the vehicle. The complainant was eventually pushed or thrown out of the vehicle. He entered Mora's taxi and Mora continued following the vehicle.
The complainant and Ramirez testified that Mora followed the vehicle without losing sight of it. Mora testified that he had to stop the taxi for a red light, then "followed in the direction where the car went." Either the complainant or Ramirez told Mora to stop because he "saw one of the guys around here." Then both the complainant and Ramirez exited the taxi.
The complainant and Ramirez testified that they chased the defendant on foot. According to the complainant, the defendant stopped running, took a "fighting position," and began throwing punches. Mora, who had driven away, eventually returned and saw two men fighting on the ground. He testified that they were the men who were "fighting from the beginning." Police officers and emergency medical personnel responded to the scene and the complainant and the defendant were both transported in ambulances to receive medical care.
The weight of evidence analysis "involves a two-step approach wherein the court must (1) determine whether, based on all the credible evidence, an acquittal would not have been unreasonable; and (2) weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Sanchez, 32 NY3d 1021, 1023 [internal quotation marks omitted]). Any discrepancies in the evidence present credibility determinations that are best made by the factfinder, who had the opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383; People v Bleakley, 69 NY2d 490).
The complainant and Ramirez both identified the defendant as the person who stole the complainant's wallet. Mora was not asked by either the People or the defendant's counsel to identify the person who stole the defendant's wallet, but he did not testify that he had witnessed the wallet being stolen. Mora did testify that he observed the same men who were "fighting from the beginning." The defendant contends that Mora described the perpetrator as wearing a white shirt, while the defendant was arrested wearing a black sweater. However, at the time of the arrest, the defendant was wearing a white t-shirt under the black sweater, and, as the People contend, he could have put on a sweater over the white t-shirt, particularly during the time that both the complainant and Ramirez were in Mora's taxi, following the vehicle in which the defendant rode.
The defendant's theory of the case, that the complainant mistakenly believed that the defendant was the person who had taken his wallet and then lied to avoid punishment for assaulting the defendant, is not implausible. But there was no evidence of such a motivation and, in any event, it required an assessment of credibility best left to the factfinder. Further, although my colleagues in the majority credit Mora's testimony over that of the complainant and Ramirez, the Assistant District Attorney represented that Mora and his wife were afraid of the defendant and did not want the defendant to find out where they lived. The factfinder was in the best position to observe Mora and assess whether he appeared to be afraid and, if so, the extent to which his fear affected his testimony.
The credibility issues that the defendant raises on appeal were fully explored at trial and highlighted by defense counsel during summation (see People v Schouenborg, 42 AD3d 473, 473-474). The defendant's counsel cross-examined the complainant and Ramirez regarding their ability to observe the defendant's face and the inconsistencies between their trial testimony, their grand jury testimony, and the police reports. The defendant's counsel also cross-examined the complainant regarding his testimony that the defendant exited the vehicle right in front of Mora's taxi and regarding the severity of the defendant's injuries, and cross-examined Mora with respect to his testimony that he lost sight of the vehicle when he stopped at the red light. The Supreme Court, as the factfinder in this nonjury trial, accepted the complainant's and Ramirez's version of the events and disregarded the fact that Mora's testimony was not entirely consistent. The court's credibility determinations should be accorded deference (see People v Romualdo, 215 AD3d 692; People v Taverez, 155 AD3d 783). The relative probative force of conflicting testimony and the relative strength of conflicting inferences do not warrant reversal.
The defendant also contends that the evidence was legally insufficient to support his conviction of assault in the third degree. The defendant failed to preserve this contention for appellate review (see CPL 470.05[2]). In any event, viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620, 621), the evidence was legally sufficient to establish the defendant's guilt of assault in the third degree beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d 342), we nevertheless accord great deference to the factfinder's opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383, 410; People v Bleakley, 69 NY2d 490, 495). Upon reviewing the record here, the verdict of guilt as to that crime was not against the weight of the evidence (see People v Romero, 7 NY3d 633).
Accordingly, I would affirm the judgment of conviction.
ENTER:
Darrell M. Joseph
Clerk of the Court