The People of the State of New York, Respondent,
against
Norman Todd, Appellant.




Nassau County Legal Aid Society (Jeremy L. Goldberg, Argun M. Ulgen of counsel), for appellant.
Nassau County District Attorney (Andrea DiGregorio, Mary Faldich of counsel), for respondent.

Appeal from a judgment of the District Court of Nassau County, First District (Martin J. Massell, J.), rendered March 18, 2015. The judgment convicted defendant, upon a jury verdict, of stalking in the fourth degree (Penal Law § 120.45 [1]). The appeal brings up for review the denial, after a hearing (Douglas J. Lerose, J.), of the branches of defendant's omnibus motion seeking to suppress his statement to the police and identification testimony.




ORDERED that the judgment of conviction is reversed, on the law, and the matter is remitted to the District Court for a new trial.
An information, dated January 21, 2013, charged defendant with stalking in the fourth degree under Penal Law § 120.45 (1). The factual part of the information alleged, in pertinent part, that, at about 4:50 p.m. on October 22, 2012:
"Defendant Norman Todd placed the victim in a state of fear and alarm at her place of employment which is the McDonalds restaurant located at 1050 Front Street Uniondale. Your deponent states [that] part of the victim's job description is working at the drive up window. The defendant engaged the victim in conversation by stating you are so beautiful, you are my fantasy, I fantasize about you and the things I would do to you.' [*2]Your deponent states after seeing the defendant she recognized him [as] someone who frequently comes to that McDonalds when she is working. Your deponent further states, while the victim was walking home from work on a Saturday or Sunday in July 2012 the defendant jumped out of some bushes on the corner of Chester [Street] and Oakley [Street in] Uniondale startling her. He then stated to your victim I watch you walk home from work and why don't you come with me.'
On [December 28, 2012] the defendant did return to the McDonalds drive up window he saw that the victim was working at the first window where he paid for his order, the victim saw the defendant pull up [and] she recognized him and backed away from the window in an attempt not to be seen by the defendant. Your deponent further states the defendant then pulled his vehicle forward to the second window to pick up his food where he engaged in a conversation with [a male co-worker]. The witness stated the defendant said You should hit that' as he referred to the victim. Your deponent states the defendant then stated to [the] witness no really you should f*ck that' again referring to [the] victim. The defendant refused to leave the drive up window, he again asked [the] witness are you going to?' still referring to the victim.
Your deponent states the defendant's actions placed the victim in grave fear of physical injury that she had to change her name tag on her uniform so the defendant doesn't know her first name.
The above is based on information and belief the source of said information being the supporting depositions of the victim, the witness, [a] secured video surveillance of the defendant, the statement of admission of the defendant and your deponent's investigation."
The video referenced in the information depicts defendant at the McDonald's drive-thru window on October 22, 2012. It is undisputed that the video contains no sound.

On October 22, 2012, the victim provided a supporting deposition, which, in pertinent part, states as follows:
"I was working at the drive-thru, when an unknown male black, late 40's, 6'3", gray beard and glasses pulled up for his order in a dark colored SUV and stated you are so beautiful, you are my fantasy. I fantasize about you & the things I would do to you,' I was very scared at this point. The man [then] took his order [and] drove away. The car behind him heard the conversation and wrote down the license plate of the subject vehicle. It is [New York plate] FSW5272 which is a 2012 Honda Pilot, gray. After seeing this man [and] speaking to him, I remember seeing him often at the McDonald's. I also remember on a Saturday or Sunday in July seeing this man. I was walking home from work when this man came out of the bushes and began to wave at me and said I watch you walk home from work' and why don't you come [with] me.' Also, for the last few months, an [*3]unknown male has called McDonalds numerous times asking when I am working, what days [and] times [and] other things about me. My manager at the McDonalds is aware of the situation."
On January 21, 2013, the victim's coworker signed a supporting deposition, which, in pertinent part, states as follows:
"On Friday, December 28, 2012, I was working at my job at McDonalds [at] the drive through window. My coworker . . . was . . . working the other window. I noticed that [she] had backed away from her window. As a car pulled up it was [a] black SUV. The guy who was driving was a dark skinned male black with a grey and black beard. He was wearing glasses. I was working fast because the drive up was very busy. I gave the guy his food and he said you should hit that' as he [referred] to [the victim] at the other window. No really you should f*ck her.' The guy would not pull away from the window. He stayed there and I closed the window. When I looked back he was still at the window. I . . . already gave him his food. I opened the window and he said are you going to' again [referring] to [the victim]. He just was staring at me. He was creepy. I wanted him to leave because the line was getting longer. I said to him alright [yeah, yeah] as I tried to brush him off so he would leave. He finally left the drive up window. I told [the victim] what he said [and] she looked afraid. She said that's the guy who has been stalking me. She then called her mother. The guy is tall and about 50 years old."
As part of an omnibus motion, defendant moved to suppress his statement to the police and the victim's identification testimony. The District Court granted pretrial Huntley, Dunaway, Wade and Sandoval hearings. Defendant's motion also sought to dismiss the information, together with the supporting depositions, as facially insufficient. In an order dated July 16, 2013, the District Court (Martin J. Massell, J.) denied the branch of defendant's motion seeking to dismiss the information. The court determined that the "information gives the defendant notice that he is charged with engaging in a course of conduct directed at the complainant and that the alleged conduct was likely to cause reasonable fear of harm."
At the suppression hearing, a Nassau County police detective testified that he had become involved in a stalking investigation when a young female and her mother had come to the precinct to report the offense. She told the detective that, while she was working at the McDonald's drive-thru window on October 22, 2012, a male drove up "and stated some inappropriate thing to her that placed her in fear for her safety." She remembered him "from past incidents from being a customer and also from an incident that happened when she was walking home from work." The man had previously "stepped out of some bushes and stated to her, [']I watch you walk home from work every day. Why don't you come with me.['] " The man came back to the McDonald's drive-thru in December. He passed her window and didn't say anything to her. He went to the next window and spoke to her coworker. She described the man as a black male, approximately six feet three inches tall, in his late 40's, with a gray beard, wearing a baseball hat. The victim provided the detective with the license plate number of the vehicle [*4]driven by the perpetrator, which she had received from a motorist that was on the line at the McDonald's drive-thru window. The detective determined that the vehicle was a Honda Pilot, which was parked at a home in Uniondale. He also received a video taken on October 22, 2012, from the manager of the McDonald's. The video contained no sound. The person driving the Honda Pilot in the video matched the description of the perpetrator that had been provided by the victim.
The detective went to the address in Uniondale approximately 20 times in an attempt to locate the perpetrator. The Honda Pilot, bearing the same license plate number, and a 2008 black Ford Edge were parked at the address. At approximately 1:05 p.m. on January 21, 2013, the detective and his partner went to the address. A man, who matched the description of the perpetrator and was subsequently identified as defendant, exited the house, entered the black Ford Edge, and drove away. He saw defendant's eyes in the rear view mirror. Defendant's driving became "a little more erratic and his speed picked up." Defendant made a U-turn in a shopping center parking lot, and then made a left turn out of the parking lot, while failing to yield to, and cutting off, a vehicle that was in front of him. The detective turned on his lights and sirens, and attempted to perform a motor vehicle stop. Defendant drove back to the house in Uniondale, where he stopped and was arrested. Defendant was transported to the precinct.
The detective then prepared a photo array. Defendant's photograph was obtained from the Department of Motor Vehicles. A computer provided "a selection of people who have similar features." The detective has the ability to delete "the ones that are way off." At 3:21 p.m. on January 21, 2013, the detective and his partner went to the victim's home, interviewed her, and showed her the photo array. The detective used the array even though some of the photographs of the individuals were of different sizes, some had different hairlines and types of facial hair, and the backgrounds were different. The victim chose a photograph of defendant within seconds, stating that he was "the one . . . who has been stalking me at McDonalds." Defendant was the same person the detective had arrested and who was in the video obtained from the McDonald's manager. The victim circled, initialed, and dated the area around defendant's photograph.
At approximately 6:00 p.m. on January 21, 2013, the detective, at the precinct, advised defendant of his Miranda rights by using a Nassau County Police Department card. Defendant indicated that he understood the rights. The detective personally observed defendant sign the card. He did not stop after reciting each right to make sure defendant understood them. The detective wrote a statement while he interviewed defendant, who was not handcuffed at the time. Defendant reviewed the statement, and the detective read it back to him. Defendant made no corrections and indicated that the statement was true and accurate. Defendant never asked to speak to an attorney, and did not indicate that he wanted to remain silent. The statement, signed by defendant, provides in pertinent part, as follows:
"My name is Norman Todd, I am 50 years old having been born on 2-4-1962. I reside at 63 East 177th Street in the Bronx, New York, apartment 4-A rear and at 1320 Admiral Lane in Uniondale. . . . I have been told by the detective that I have the right to remain [*5]silent and that any statements I make may be used against me in Court. I have been told that I have the right to talk with a lawyer before answering any questions or to have a lawyer present at any time. Further, I have been advised that if I cannot afford to hire a lawyer one will be furnished [for] me, if I wish, and I have the right to keep silent until I have had the chance to talk with a lawyer. I understand my rights and make the following statement freely and voluntarily. I am willing to give the statement without talking with a lawyer or having one present.
I have been to the drive-up window at McDonalds on Front Street. I get McDonalds for my son and the other children. One time I saw a beautiful girl working at the drive-up window. I complimented the girl at the window by saying that she was beautiful and that she was my fantasy. I was only being flirtatious and complimentary. I did not mean any harm. I went back to the McDonalds at the end of December and I saw her working at the first window. I moved up to the next window and saw a young man working. I said to him you should hit that or you should get with that. Again I was just talking to him, man to man, I didn't mean any harm or to make anyone afraid. I was referring to the girl at the other window. I am sorry if I made anyone afraid."
The statement was completed at about 6:30 p.m. The detective had not been with defendant continuously between 1:05 p.m. and 6:30 p.m. He did not know whether other officers had spoken to defendant when the detective had not been present.

Defense counsel argued that defendant's arrest was not based upon probable cause and that defendant's statement should be suppressed "because he was clearly in custody and he was at the [police] station for several hours not free to leave and subject to custodial interrogation." The detective did not know if any other person had spoken to defendant between the time he had been brought to the precinct and the time he had given his statement, a period of five hours. Counsel also argued that the photo array was unduly suggestive, and that defendant's photograph appeared "to be zoomed in" as compared to the other photographs.
The People argued that defendant's arrest was supported by probable cause, as a witness had provided a description of the suspect and a license plate of the vehicle he had been driving. The detective ran the plate, obtained the address "and observed the defendant." The video showed that there was "a significant amount of interaction between the complaining witness and the defendant and based on that the [detective] continued to conduct a thorough investigation." Defendant subsequently committed a traffic violation. Defendant understood and waived his Miranda rights and signed a written waiver of those rights. He specifically indicated that he did not want to speak to a lawyer or remain silent. The photo array was computer-generated, and the computer, to some extent, selected photographs with characteristics similar to those of defendant. The "victim instantaneously identified the defendant." The photographs in the array were all of black males with facial hair. The prosecutor conceded that the backgrounds of the photographs were different, and defendant's photograph was "somewhat zoomed in a bit more," but asserted that the array was not unduly suggestive.
In a written decision dated July 21, 2014, the hearing court (Douglas J. Lerose, J.) found the detective's testimony to be credible. The court determined that the photo array identification was neither tainted nor unreliable. Moreover, defendant had provided his statement to the detective "voluntarily after he was given the proper warnings." Finally, the court found "that there was probable cause for the arrest." Thus, the branches of the motion seeking to suppress defendant's statement and the victim's identification testimony were denied.
At a pretrial Sandoval hearing, the People requested that defendant, if he chose to testify, be questioned during cross-examination regarding three February 9, 1993 convictions, of criminal possession of a controlled substance in the third degree, criminal sale of a controlled substance in the third degree, both class B felonies, and criminal possession of a controlled substance in the fifth degree, a class D felony. The People also requested that they be permitted to inquire regarding a September 18, 1987 conviction of attempted rape in the first degree, a class C felony. The People argued that "although the defendant's convictions are not necessarily acts that involve dishonesty, however they are indicative of [his] willingness or disposition to voluntarily place advancement of his individual self-interest ahead of the interests of society, and, thus, may be relevant to suggest his readiness to do the same on the witness stand." Moreover, the probative value of the convictions was not diminished by the fact that they were at least 20 years old. Defendant opposed the application, noting that the convictions were 22 years and 27 years old, respectively, and were extremely prejudicial. The 1993 drug convictions did not "involve deceit, dishonesty or fraud," and were thus "not relevant to a person's credibility or veracity to tell the truth." The 1987 attempted rape conviction would serve only "to inflame the jury" and to show defendant's propensity to commit similar crimes. The court (Martin J. Massell, J.) excluded the 1993 convictions, but permitted the prosecutor to inquire about the 1987 conviction to the extent of whether defendant was "convicted of a crime, what crime and when."
During jury selection, the prosecutor asked if any of the prospective jurors had "any moral, religious or philosophical" impediment preventing them from finding defendant guilty if the prosecutor proved defendant guilty beyond a reasonable doubt. One prospective juror replied that he had a daughter, which might make a difference. He did not "want to see anybody stuck," so he did not know if that would make a difference. The prosecutor then asked if he could "separate your daughter from what happened in this case?" The prospective juror replied, "I guess I could." The prosecutor asked if he could be fair and impartial, to which the prospective juror replied, "[y]es." During questioning by defendant's counsel, the prospective juror indicated that he had daughters, and that he would be thinking about that as he heard the evidence and keeping it in the back of his mind. When asked if he "can't promise . . . that that's not going to play on your decision when you sit back in the jury room," he replied that it "[d]epends on the evidence." When counsel stated, "[i]t depends, but you can't promise me," the prospective juror responded, "[n]o." Defendant's counsel challenged the prospective juror for cause. The People opposed the challenge. The District Court (Martin J. Massell, J.) denied the challenge for cause, and defendant exercised a peremptory challenge. Defendant subsequently exhausted his peremptory challenges.
At the trial, the victim testified in accordance with her account in the supporting deposition. In addition, she testified that, in July 2012, she was walking home, texting on her cell phone, when she saw an "[o]lder guy with a beard and glasses," wearing a dark-colored baseball hat and driving a gray SUV, stopped at a light. The man was staring at her. When she was about a mile from her house, she saw the man, about 10 feet away from her, standing next to a bush. He whispered to her, saying "psst," and then called to her to "come here," to come with him. He was giving her a "creepy look." He told her that he had seen her walking. She was scared and walked faster. She thought that he could have "snatched" her up and taken her with him. The man then walked to his car, and she arrived home about 10 minutes later.
The victim further testified that, at approximately 5:00 p.m. on October 22, 2012, defendant pulled up to the McDonald's drive-thru window in a gray SUV. The victim took his food order. She did not recognize defendant at first, but after defendant started talking to her, she remembered who he was. He had the same beard and glasses, and was wearing the same hat. Defendant told her how beautiful she was, that she was "a dream of his, a fantasy of his." She became scared when she realized that the man was the same person who had accosted her when she had been walking home in July. No customer had ever spoken to her in that manner. Another customer gave a piece of paper to a coworker on which was written the license plate number of the vehicle driven by defendant. The victim changed her name at work in case defendant came back again, and stopped walking home from work. On December 28, 2012, the victim was working at the McDonald's as a "runner," a person working at the second drive-thru window who gets the food after it was purchased. Her coworker was working at the first window. At about 8:00 p.m., she brought food to her coworker for an order, when she saw defendant. She backed up because she did not want defendant to see her. She became scared again because this was the third time that she had seen him.
The detective testified in a similar manner as he did at the suppression hearing.
The victim's coworker testified in accordance with his supporting deposition with respect to his interaction with defendant at the McDonald's drive-thru window at about 8:00 p.m. on December 28, 2012. He further testified that defendant had been looking at the victim while defendant had spoken to the coworker. He indicated that his interaction with customers are timed, and he was trying to "hurry it up" because the line was "getting long." Defendant had been at the window between two and four minutes, which was longer than a customer should be there. After defendant left, the coworker spoke to the victim. She was startled, scared, and nervous.
Defendant's motion to dismiss the stalking charge on the ground that the People failed to establish the elements of that crime was denied. Defendant did not call any witnesses or otherwise present any evidence. The jury found defendant guilty of stalking in the fourth degree. On March 18, 2015, the District Court sentenced defendant to a term of 30 days of incarceration and one year of probation. The court also imposed a $175 mandatory surcharge, a $25 crime victim assistance fee, and a $50 DNA fee, and issued a stay-away order of protection against [*6]defendant and in favor of the victim.
On appeal, defendant contends, among other things, that the information was jurisdictionally defective, that the evidence was legally insufficient to support his conviction, and that the verdict of guilt was against the weight of the evidence. Defendant also argues that the arrest was not based on probable cause, that the District Court erred in permitting the detective to testify regarding the circumstances of defendant's arrest, that the photo array was impermissibly suggestive, that the court erred in its Sandoval ruling, and that the court erred in denying defendant's challenge for cause of the prospective juror who had a daughter.
A valid and sufficient accusatory instrument is a nonwaivable jurisdictional prerequisite to a criminal prosecution (see People v Dreyden, 15 NY3d 100, 103 [2010]). An information is sufficient on its face if it contains nonhearsay factual allegations of an evidentiary nature which establish, if true, every element of the offense charged and the defendant's commission thereof (see CPL 100.15 [3]; 100.40 [1]; People v Henderson, 92 NY2d 677, 679 [1999]; People v Alejandro, 70 NY2d 133, 136-137 [1987]; People v Westwood, 53 Misc 3d 74, 77 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2016]).
The facts alleged in the information in support of the charge of stalking in the fourth degree were legally sufficient, in that they established that defendant, "intentionally, and for no legitimate purpose, engage[d] in a course of conduct directed at a specific person and [knew] or reasonably should [have] know[n] that such conduct . . . [was] likely to cause reasonable fear of material harm to the physical health, safety or property" of the victim (Penal Law § 120.45 [1]). The Court of Appeals has held that there is no need for proof that the accused intended "a specific result, such as fear or harm" (People v Stuart, 100 NY2d 412, 426 [2003]), or proof of the "subjective fear or sensibilities of the alleged victim" (id. at 428). An element of the offense is that the defendant intentionally engaged in a "course of conduct," which, while not defined in the Penal Law, has been construed to mean "a pattern of conduct composed of a series of acts over a period of time . . . evidencing a continuity of purpose" (People v Payton, 161 Misc 2d 170, 174 [Crim Ct, Kings County 1994], quoted with approval in People v Ubbink, 120 AD3d 1574, 1575-1576 [2014]). Further, the conduct must be viewed as a whole and not evaluated as a separate act in each occurrence (see People v Westwood, 53 Misc 3d at 79; People v Brandel, 30 Misc 3d 134[A], 2011 NY Slip Op 50082[U], *2 [App Term, 2d Dept, 9th & 10th Jud Dists 2011]; People v Tralli, 88 Misc 2d 117, 118 [App Term, 2d Dept, 9th & 10th Jud Dists 1976]). In the stalking context, "continuity of purpose" is not the intent to cause a particular fear of harm but to commit acts which create a reasonable likelihood of fear of harm.
Here, the information, supplemented by the supporting depositions, sufficiently alleged that defendant engaged in a course of conduct that created a reasonable likelihood of fear of harm. Contrary to defendant's contention that the alleged incidents were brief, distinct and isolated, remote in time, and remarkably different from each other, the three alleged incidents occurred within a five-month period. The fact that the alleged incidents lasted only a few minutes each is not a ground for dismissal. The alleged incidents represented a series of [*7]intentional acts united in a continuity of purpose that established a course of conduct directed at the victim with no legitimate purpose. Defendant should have at least reasonably known that these incidents were likely to cause reasonable fear of material harm to the victim's physical health or safety.
Viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620 [1983]), we find that it was legally sufficient to establish defendant's guilt of stalking in the fourth degree beyond a reasonable doubt. The testimony of the victim and her coworker, which essentially dovetailed their supporting depositions, established the elements of stalking in the fourth degree.
In conducting an independent review of the weight of the evidence (see People v Danielson, 9 NY3d 342, 348 [2007]), great deference is accorded to the jury's opportunity to view the witnesses, hear their testimony, and observe their demeanor (see People v Mateo, 2 NY3d 383 [2004]; People v Bleakley, 69 NY2d 490, 495 [1987]). The reviewing court must determine, based on the credible evidence, whether a different result would have been unreasonable (see People v Lane, 7 NY3d 888, 890 [2006]; People v Mateo, 2 NY3d 383 [2004]; People v Bleakley, 69 NY2d 490, 495 [1987]). Upon reviewing the record, we find that the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633 [2006]). In July 2012, a 50-year-old man essentially hiding in the bushes came out, whispered at a 17-year-old girl and asked her to come with him. Three months later, defendant, who knew that the victim worked at a McDonald's, came to her drive-thru window and, in addition to ordering food, told her that she was beautiful and that she was his fantasy. Finally, two months after the October incident, while the victim was present, defendant engaged in a lengthy and vulgar discussion with the victim's male coworker, encouraging him to have sex with the victim. The coworker testified that defendant lingered at the window for several minutes, longer than most customers stay at the window to pick up food.
Defendant's arrest was predicated on probable cause. The police learned, after having been provided with the license plate number of the vehicle driven by the perpetrator at the McDonald's on October 22, 2012, that the vehicle was a Honda Pilot, which was parked at a specified address in Uniondale. Furthermore, upon observing the video provided by the manager of the McDonald's, the police determined that the person in the video driving the Honda Pilot matched the description of the perpetrator provided by the victim. On January 21, 2013, the police observed a man, who matched the description of the perpetrator, leave the home located at the address in Uniondale. It is undisputed that the man who left the address was defendant.
We reject defendant's contention that the photo array was unduly suggestive. After defendant's identity became known, the detective obtained his DMV photograph, prepared a photo array, and, upon showing the array to the victim, almost immediately obtained a positive identification of defendant as the perpetrator of the crime of stalking in the fourth degree. The photo array consisted of six black males, all of whom appear to be at least 40 years old, with short dark hair and facial hair. While the backgrounds of the photographs appear to be different, [*8]the array was not unduly suggestive (see People v Burroughs, 98 AD3d 583 [2012]). There was no substantial likelihood that defendant would be singled out for identification (see People v Chipp, 75 NY2d 327, 336 [1990]). "There is no requirement that the photograph of a defendant shown as part of a photo array be surrounded by photographs of individuals nearly identical in appearance" (People v Starks, 91 AD3d 975, 975 [2012]).
Nevertheless, the judgment must be reversed and a new trial ordered because of an improper Sandoval ruling and the court's improper denial of a challenge for cause of a prospective juror.
The court erred in permitting the prosecutor, in the event defendant chose to testify, to ask defendant whether he had been "convicted of a crime, what crime and when," which would have elicited the response that he was convicted in 1987 of attempted rape in the first degree. Although "questioning concerning other crimes is not automatically precluded simply because the crimes to be inquired about are similar to the crimes charged" (People v Pavao, 59 NY2d 282, 292 [1983]; see People v Hayes, 97 NY2d 203, 208 [2002]; People v Walker, 83 NY2d 455, 459 [1994]), "cross-examination with respect to crimes or conduct similar to that of which the defendant is presently charged may be highly prejudicial, in view of the risk, despite the most clear and forceful limiting instructions to the contrary, that the evidence will be taken as some proof of the commission of the crime charged rather than be reserved solely to the issue of credibility" (People v Sandoval, 34 NY2d 371, 377 [1974]; see People v Calderon, 146 AD3d 967, 968-972 [2017]; People v Brothers, 95 AD3d 1227, 1228-1229 [2012]). Under the circumstances of this case, including the fact that the conviction was 27 years old and involved a crime committed against a female victim, we find that the court's decision to permit the prosecutor to elicit the fact that defendant had been convicted of attempted rape was unduly prejudicial (see People v Brothers, 95 AD3d at 1229; see also Jerome Prince, Richardson on Evidence § 6-410 [Farrell 11th ed 1995]).
"A challenge for cause to a prospective juror may be made on the ground that the juror has a state of mind that is likely to preclude him or her from rendering an impartial verdict" (see CPL 270.20 [1] [b]). When a prospective juror reveals knowledge or opinions reflecting a likelihood of bias, the juror must expressly state in unequivocal terms that his or her prior state of mind will not influence his or her verdict, and must also state that he or she will render an impartial verdict based solely on the evidence. Where a prospective juror offers such assurances, the trial court has discretion to deny the challenge for cause if it determines that the juror's promise to be impartial is credible (see People v Johnson, 40 AD3d 1011, 1011-1012 [2007]; People v Ortiz, 37 AD3d 361, 362 [2007]). If a prospective juror makes statements that "cast serious doubt on" his or her "ability to render an impartial verdict" (People v Arnold, 96 NY2d 358, 363 [2001]), that prospective juror must be excused for cause unless he or she provides "an unequivocal assurance that" he or she "can set aside any bias and render an impartial verdict based on the evidence" (People v Johnson, 94 NY2d 600, 614 [2000]; see People v Lewis, 71 AD2d 1582, 1583 [2010]). An additional question or two at voir dire could have dispelled any doubt as to equivocation and assured an impartial jury (see People v Chambers, 97 NY2d 417, [*9]419 [2002]). It is the trial court's obligation, not the defense counsel's, to require that a prospective juror expressly state that his or her state of mind will not influence his or her verdict, and that he or she will render an impartial verdict on the evidence (see People v Torpey, 63 NY2d 361, 367 [1984]; People v Biondo, 41 NY2d 483, 485 [1977]; People v Thigpen, 277 AD2d 261, 261-262 [2000]). 
Here, the prospective juror replied that he had a daughter. He did not "want to see anybody stuck," so he did not know if that would make a difference. The trial court did nothing to inquire whether the prospective juror could keep an open mind, and the prospective juror's final statement was that he could not promise that he would not think about his daughter when considering the evidence. Thus, the prospective juror never provided an unequivocal assurance that he could be fair and impartial. Consequently, the court erred in denying defendant's challenge for cause of that prospective juror.
In view of the foregoing, the matter must be remitted for a new trial. While defendant has already served his sentence, dismissal in the interest of justice is not warranted in this case in which a serious crime has been charged (see People v Allen, 39 NY2d 916, 918 [1976]; People v Gavrilov, 49 Misc 3d 138[A], 2015 NY Slip Op 51562[U] [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2015]).
In light of our determination, we need not reach defendant's remaining contentions.
Accordingly, the judgment of conviction is reversed and the matter is remitted to the District Court for a new trial.
MARANO, P.J., TOLBERT and GARGUILO, JJ., concur.
ENTER:
Paul Kenny
Chief Clerk
Decision Date: November 30, 2017