People v Spratley (2018 NY Slip Op 01488)





People v Spratley


2018 NY Slip Op 01488


Decided on March 7, 2018


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 7, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

REINALDO E. RIVERA, J.P.
L. PRISCILLA HALL
BETSY BARROS
VALERIE BRATHWAITE NELSON, JJ.


2015-04116
 (Ind. No. 65/13)

[*1]The People of the State of New York, respondent,
v
Lakime J. Spratley, appellant.


Del Atwell, East Hampton, NY, for appellant.
William V. Grady, District Attorney, Poughkeepsie, NY (Kirsten A. Rappleyea of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the County Court, Dutchess County (Stephen L. Greller, J.), rendered April 22, 2015, convicting him of murder in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.
ORDERED that the judgment is reversed, on the facts, and the matter is remitted to the County Court, Dutchess County, for further proceedings pursuant to CPL 330.20.
On July 10, 2013, at around 11:30 p.m., the defendant shot and killed Talesha Wright in a grocery store in Poughkeepsie. At trial, the defendant asserted the affirmative defense of lack of criminal responsibility by reason of mental disease or defect (Penal Law § 40.15). The People did not dispute that the defendant was suffering from a mental disease or defect at the time of the shooting, but they disagreed as to the nature of the disease or defect and whether it caused the defendant to lack substantial capacity to know or appreciate either the nature and consequences of his conduct or that it was wrong. The jury convicted the defendant of murder in the second degree and criminal possession of a weapon in the second degree, implicitly rejecting his affirmative defense. On appeal, the defendant contends, among other things, that the verdict of guilt was against the weight of the credible evidence as it found that he failed to establish the affirmative defense by a preponderance of the evidence. We agree, and therefore reverse his convictions and remit the matter to the County Court, Dutchess County, for further proceedings pursuant to CPL 330.20.
The incident was captured on several surveillance cameras, which show that at the subject time, the defendant was walking on a sidewalk on Academy Street in Poughkeepsie. An SUV traveled down the street and stopped in front of the A & M Grocery. Wright, who had been hanging out of the rear driver's side window as the SUV was moving, exited through the vehicle's window and walked into the store. The defendant continued to walk down the sidewalk until he reached the A & M Grocery and then turned to enter the store, and, from the doorway, pulled a gun from the waistband of his shorts and fired at Wright, who was standing only a few feet away at the counter. The defendant exited the store and paced outside for approximately one minute and then slowly walked a short distance away. Moments later, police cars arrived and the defendant immediately put his hands in the air and laid down on the ground. A police officer handcuffed the defendant, and according to the officer, the defendant "stated something about a suitcase and he said [*2]that bitch stole my clothes and they know how they get when they mess with me."
In a videotaped interview at the police precinct, the defendant told detectives that he had been "paranoid," "hearing voices and stuff," and "having issues or whatever with [himself]." He stated that he had seen Wright in the SUV three to four times earlier that day without incident. However, the defendant told detectives that, shortly before the shooting, he had seen a blue suitcase that belonged to him sitting on a street corner. He stated that he looked at the suitcase for a long time, and was uncertain of whether what was happening was "reality." The defendant said that he was certain that the suitcase was his, but walked away to try to "figure it out." As the defendant was walking, the SUV with Wright came down the street. The defendant told the detectives that at this time, he was hearing voices that were telling him "all kinds of . . . negative stuff." When the SUV pulled up, the defendant believed that Wright was making signals with her hands at him, including "like gun [signals] and signs," and that she was wearing his shorts. The defendant believed that "they" were playing "mind games" with him. He stated that when Wright "put a gun sign on," he thought, "hold on, you're talking about endangering my life," and it "really triggered" him. The defendant told the detectives that he recalled walking into the grocery store and asking Wright why she was wearing his shorts. The defendant claimed that he then "blanked out," and he did not remember whether Wright responded to him and did not remember shooting her. When one of the detectives pressed the defendant to try to remember what happened after he was "triggered," the defendant said "this" happened, and pointed to his shoe, leg, and shorts. The detective asked the defendant whether he had urinated on himself, and the defendant replied, "yeah, I was hearing voices." The defendant told the detectives that he recalled feeling "bad" after he left the store and feeling "lost" when he was on the sidewalk following the shooting. The defendant admitted to the detectives that he had been carrying the gun with him all day because he was hearing voices and needed to protect himself. Wright's wife testified that she and Wright knew the defendant through a mutual friend, and there had never been any disagreements between them.
The defense presented the expert testimony of a board-certified forensic psychiatrist who opined that at the time he possessed the gun and shot Wright, the defendant was suffering from a severe, persistent, and serious mental disease, namely, schizoaffective disorder, and that because of this mental disease the defendant lacked substantial capacity to know or appreciate that what he did was wrong. The defense expert described schizoaffective disorder as having a combination of symptoms of both schizophrenia and bipolar disorder. To support the expert's conclusion, the defense presented evidence that throughout the defendant's childhood, his parents were severely drug addicted and that in 1995, when the defendant was about 15 years old, his mother, suffering from mental illness, stabbed his father to death. The defendant was imprisoned as a juvenile offender in 1995 for assault and attempted robbery. He was released from prison briefly, but then convicted of selling a controlled substance, so that he remained incarcerated almost continuously from 1995 to December 2010. The defendant received numerous disciplinary citations while incarcerated, and was in isolation in the special housing unit during the majority of his time in prison.
The defense evidence also showed that the defendant began complaining of hearing voices in 1995 or 1996 when he was 15 or 16 years old. At times, the defendant expressed a belief that corrections officers and/or other detainees were poisoning his food. However, prison staff repeatedly concluded that the defendant was "faking" in order to gain special favors, and thus he was treated punitively for his behavior. In 2008, the defendant was diagnosed with bipolar disorder with psychotic features, and was prescribed antipsychotic medication for the first time. The defense expert testified that the defendant's prison records reflect that the defendant's behavior changed drastically after he was medicated, his symptoms went away and he was able to avoid citations.
The defendant was released on parole in December 2010. Upon his release, the defendant was treated at a community mental health clinic. The defense expert testified that the notes from the clinic indicate that at the December 2010 intake interview, the defendant complained of hearing voices that were telling him to hurt himself and other people. The defendant expressed a belief that there was a secret society of assassins that were trying to kill him, and that the society utilized both people he knew and strangers in its conspiracy to assassinate him. The clinic treated the defendant from December 2010 until March 2013 for schizoaffective disorder with antipsychotic, [*3]mood stabilizing, and antidepressant medications. It is unclear from the record why the defendant's treatment stopped in March 2013.
On June 20, 2013, 20 days before he shot Wright, the defendant was in an automobile accident in which another vehicle struck the vehicle he was driving. The hospital records indicated that the defendant exited his vehicle after the accident and appeared as though he was going to attack the other driver, but that he then had a seizure and was brought to the hospital. The defense expert testified that the defendant told him that at the time of the accident, he believed the driver of the other vehicle was an assassin from the secret society and that the accident was an assassination attempt. The community mental health clinic records indicated that the defendant returned to the clinic several times after the June 20 automobile accident asking that he be prescribed a particular antipsychotic medication that he had received when he was being treated at the clinic, but that the defendant was unable to get the prescription filled. These attempts included one on the day before the subject shooting, at which time the clinic evaluated the defendant as being at "the highest lethality risk for hurting someone else and hurting himself," but still the defendant was unable to get the prescription filled.
The defense additionally presented evidence that on the day of the shooting, the defendant called his aunt repeatedly to complain that someone was after him. The aunt testified that she found the defendant on the street at about 8:15 p.m. and tried to persuade him to go home. She stated that the defendant was talking about people who kept moving in and out of different cars and jumping from one car to another. After some time, one of the defendant's cousins came to assist, but when the cousin reached into his pocket to give the defendant's aunt some money, the defendant reacted as though his cousin was trying to draw a weapon. The two were unable to persuade the defendant to go home. The subject shooting occurred approximately two hours later.
The defense expert testified that the defendant told him that on the day of the shooting, the defendant's mother was acting in a manner that made the defendant believe that she was a member of the secret society of assassins and was going to try to kill him, and so the defendant retrieved his gun and left the apartment. The defendant further told the expert that while he was out walking, he observed several cars which he believed were being driven by members of the assassination society, who were following him and preparing another assassination attempt. The defendant told the expert that when he thought he saw Wright exit the SUV and point her fingers at him while wearing his clothing, it validated his assessment that Wright was the assassin sent to kill him. The expert explained that the defendant's fixation on his belief that the shorts belonged to him was because this constituted proof that the secret society of assassins was able to get into his apartment and it was sending a signal to the defendant that society assassins were going to kill him. The defense expert opined, with a reasonable degree of medical certainty, that at the time the defendant possessed the gun and shot Wright, he was suffering from schizoaffective disorder, and that because of the disease, he lacked the substantial capacity to know or appreciate that what he was doing was wrong because he believed he was killing the person who was coming to assassinate him.
To rebut the defendant's evidence, the People presented the testimony of a licensed psychologist with a practice in forensic psychology, who opined that at the time he shot Wright, the defendant both knew and appreciated the nature and consequences of his conduct and that the conduct was wrong. The People's expert agreed that the defendant was suffering from a mental disease or defect at the time of the subject shooting, but, based on the expert's interview with the defendant, the expert diagnosed the defendant as having an unspecified bipolar related disorder. The People's expert also diagnosed the defendant with an antisocial personality disorder, which, he testified, would not qualify as a mental disease or defect. The expert conceded that the defendant had "incorrect perceptions" and was "paranoid" at the relevant time, but he concluded that it was not the paranoia or incorrect perceptions that motivated the defendant's acts, but rather his "antisocial conduct." More specifically, the People's expert opined that the defendant acted because he believed that Wright had stolen his shorts and his "antisocial orientation" made the defendant feel justified in performing a violent act of revenge. The People's expert found that because the defendant attempted to get treatment prior to the shooting, he was aware of his paranoia and thus he was "grounded to a degree in reality" and "never gone that far." The expert also concluded that because [*4]the defendant kept the gun hidden from his mother and, while he was in public, he was aware that possessing the gun was wrong.
The People's expert noted that the defendant had not mentioned assassins when the expert interviewed him. He acknowledged that, in addition to the diagnosis relative to the defendant's community mental health treatment from December 2010 to March 2013, the defendant was diagnosed with schizoaffective disorder in January 2011 by the Dutchess County Department of Mental Hygiene, at a time when the defendant was complaining of a "shadow organization" that was after him and which had recruited his mother and grandmother to try to assassinate him. Nonetheless, the People's expert did not believe that the defendant suffered from a schizoaffective disorder. The expert opined that the defendant's auditory hallucinations were related either to his bipolar condition or substance use. Although there was no evidence that the defendant had tested positive on any drug test or admitted to any drug use, the People's expert theorized that the defendant had begun to use PCP upon his release from prison and this is what had caused his hallucinations. This theory was based on the defendant's previous conviction for selling a controlled substance and the notations in his prison records indicating that he had a polysubstance abuse problem, with one entry indicating a preference for PCP, and the expert's opinion that it was "very rare for someone to sell substances without using substances."
The jury convicted the defendant of murder in the second degree and criminal possession of a weapon on the second degree, and the defendant appeals.
In order to establish a lack of criminal responsibility by reason of mental disease or defect, a defendant must prove, by a preponderance of the evidence, that, at the time the defendant engaged in the proscribed conduct, as a result of mental disease or defect, he or she lacked substantial capacity to know or appreciate either (1) the nature and consequences of such conduct, or (2) that such conduct was wrong (see Penal Law §§ 25.00[2]; 40.15).
In conducting a weight of the evidence review, an appellate court must first determine whether, "based on all the credible evidence a different finding would not have been unreasonable" (People v Bleakley, 69 NY2d 490, 495; see People v Danielson, 9 NY3d 342, 348; People v Romero, 7 NY3d 633, 643). If it would have been reasonable for the factfinder to reach a different conclusion, "the court must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions" (People v Danielson, 9 NY3d at 348; see People v Romero, 7 NY3d at 643; People v Bleakley, 69 NY2d at 495). "If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict" (People v Bleakley, 69 NY2d at 495; see People v Danielson, 9 NY3d at 348; People v Romero, 7 NY3d at 643).
Here, as the People concede, a finding of not responsible by reason of mental disease or defect would have been reasonable. Moreover, upon weighing the credible evidence, we conclude that the jury was not justified in finding that the preponderance of the evidence failed to establish that the defendant lacked the substantial capacity to know or appreciate that his conduct was wrong at the time that he possessed the loaded firearm and shot Wright. The undisputed trial evidence established that at the relevant time, the defendant was suffering from auditory hallucinations, paranoia, and "incorrect perceptions" of reality. The opinion of the People's expert psychologist that the defendant did not suffer a schizoaffective disorder, notwithstanding such a diagnosis by the defendant's treating psychiatrists over the past three years, was conclusory. Moreover, the psychologist's alternative theory that the defendant's hallucinations were due to his use of PCP were purely speculative and without adequate evidentiary support. The psychologist's conclusion that the defendant was motivated by revenge against a person he mistakenly perceived to have stolen his shorts was also speculative and contrary to the credible evidence presented. We accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Romero, 7 NY3d at 644), and weigh conflicting expert evidence (see People v Wood, 12 NY2d 69, 77). However, on this record, the rational inferences which can be drawn from the evidence presented at trial do not support the conviction. Thus, contrary to the jury's determination, we find that the defendant met his burden of establishing the affirmative defense of mental disease [*5]or defect by the preponderance of the evidence. Accordingly, the judgment must be reversed and the matter remitted to the County Court, Dutchess County, for further proceedings pursuant to CPL 330.20.
In light of our determination we need not reach the defendant's remaining contentions.
HALL, BARROS and BRATHWAITE NELSON, JJ., concur.
RIVERA, J.P., dissents and votes to affirm the judgment with the following memorandum:
I respectfully disagree with my colleagues' determination to reverse the judgment. Accordingly, I vote to affirm the judgment of conviction.
In July 2013, the defendant walked into a grocery store in Poughkeepsie and brutally shot the victim, causing her death. Indeed, the incident was fully recorded on surveillance footage.
At the ensuing jury trial, the defendant asserted the affirmative defense of lack of criminal responsibility by reason of mental disease or defect (see Penal Law § 40.15). In this regard, the defendant proffered the testimony of a forensic psychiatrist who diagnosed the defendant with schizoaffective disorder. The defendant's expert testified that, at the time of the shooting, the defendant suffered from a "severe, persistent and serious mental disease, and as a result of that disease he lacked substantial capacity to know or appreciate that such conduct was wrong." On rebuttal, the People offered the testimony of a forensic psychologist, who concluded that the defendant did not suffer from schizoaffective disorder. Instead, the People's expert opined that the defendant suffered from bipolar disorder and antisocial personality disorder. According to the People's expert, the defendant "both knew and appreciated the nature and consequences of his conduct, and he knew and appreciated the wrongfulness. In other words, he did not lack substantial capacity." Based upon all the evidence presented, which included extensive cross-examination, the defendant was convicted of murder in the second degree and criminal possession of a weapon in the second degree.
On the instant appeal, my colleagues determine that the jury verdict was against the weight of the evidence. My colleagues conclude that "the jury was not justified in finding that the preponderance of the evidence failed to establish that the defendant lacked the substantial capacity to know or appreciate that his conduct was wrong at the time that he possessed the loaded firearm and shot" the victim. However, in conducting an independent review of the weight of the evidence, I am satisfied that the verdict of guilt is not against the weight of the evidence (see People v Romero, 7 NY3d 633).
A weight of the evidence review requires this Court to affirmatively review the record, independently assess all of the proof, substitute its own credibility determinations for those made by the trier of fact in an appropriate case, determine whether the verdict was factually correct, and acquit a defendant if the court is not convinced that the trier of fact was justified in finding that guilt was proven beyond a reasonable doubt (see People v Delamota, 18 NY3d 107, 116-117; People v Danielson, 9 NY3d 342, 348). "In conducting our weight of the evidence review where a defendant relies solely upon the affirmative defense of mental disease or defect, we first determine whether a finding of not responsible by reason of mental disease or defect would have been reasonable" (People v Hernandez-Beltre, 157 AD3d 814, 816). "If we answer that question in the affirmative, then we must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence, and evaluate the strength of such conclusions in order to decide whether the defendant met his burden of proving the affirmative defense of mental disease or defect by the preponderance of evidence" (id.; see People v Danielson, 9 NY3d at 348; see also Penal Law §§ 25.00[2]; 40.15). "Where conflicting expert testimony is presented, the question [of] whether the defendant suffered from a mental disease or defect at the time of the commission of the crime is for the factfinder, who may accept or reject the opinion of any expert" (People v Hill, 276 AD2d 716, 716; see People v Capela, 97 AD3d 760, 761; People v Collins, 27 AD3d 660, 661).
As set forth above, each party presented conflicting expert opinions. Both experts were eminently qualified in their respective professional fields and deemed by the County Court to be so qualified (see CPL 60.55[1]). In his brief on appeal, the defendant goes to great lengths to denigrate the People's expert. This unprofessional and disingenuous attempt to disparage the People's expert is unavailing. The testimony of the People's expert regarding the defendant's state of mind at the time of the crime was well-reasoned and supported by the evidence. That expert presented his opinions and supported his conclusions. Moreover, his experience, credentials, and qualifications in the field of forensic psychology were fully set forth in the record.
The defendant's personal, criminal, and psychiatric history were all explored, testified to by witnesses, and commented upon by counsel. The primary issue before the jury was whether at the time "when the defendant engaged in the proscribed conduct," that is, when he shot and killed the victim, "he lacked criminal responsibility by reason of mental disease or defect" (Penal Law § 40.15). "Such lack of criminal responsibility means that at the time of such conduct, as a result of mental disease or defect, [the defendant] lacked substantial capacity to know or appreciate either: (1) The nature and consequences of such conduct; or (2) That such conduct was wrong" (Penal Law § 40.15). On this point, the instant case boiled down to a battle of the experts. On the one hand, the defense expert opined that, due to a mental disease or defect, the defendant lacked substantial capacity to know or appreciate that such conduct was wrong when he committed the crimes and, on the other hand, the People's expert rebutted that testimony. In rendering its verdict, the jury, in effect, concluded that, notwithstanding the evidence provided by the defense expert, the defendant failed to establish the defense by a preponderance of the evidence.
My colleagues assert that the People "concede" that a finding of not responsible by reason of mental disease or defect would have been reasonable. Respectfully, I find no such concession in the People's brief. Instead, the People state, "[w]hile the issue of [the] defendant's sanity at the time of the murder is a very close question, it was squarely within the jury's province to resolve questions of the relative credibility of the expert opinions related thereto." This statement does not amount to a concession. It is a candid acknowledgment by the People that the jury's mandate and function is to resolve issues of credibility.
In sum, upon fulfilling my responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d at 348), and according great deference to the factfinder's opportunity to view the witnesses, hear the testimony, and observe demeanor (see People v Mateo, 2 NY3d 383, 410; People v Beakley, 69 NY2d 490, 495), I will not disturb the instant verdict. The defendant's remaining contentions are without merit.
ENTER:
Aprilanne Agostino
Clerk of the Court